Argued February 8; affirmed April 12; rehearing denied
April 26, 1938

## BOWLES *v.* CREASON ET AL.

(78 P. (2d) 324)

Department 1.

*H. A. Canaday* and *B. L. Eddy*, both of Roseburg, for appellant.

*Rice & Orcutt* and *J. V. Long*, both of Roseburg, for respondents.

ROSSMAN, J. The facts developed upon the trial are very similar to those described in *Bowles v. Creason et al.*, 156 Or. 278 (66 P. (2d) 1183), this being a retrial of that cause. In writing that decision, the late Mr. Justice CAMPBELL, after disposing of assignments of error which required a reversal of the judgment entered in favor of the defendants, stated, "As the case will have to be retried, we will avoid future mistakes by calling attention to * * *" and then reviewed the merits of many additional contentions of the parties in an endeavor to render clear the course to be pursued upon the retrial. Notwithstanding this effort to prevent error upon the retrial, the appellant (plaintiff) presents and argues 21 assignments of error.

The first assignment of error is based upon a ruling which overruled the plaintiff's objection to a question propounded by the defendants' counsel to the defendant Thornton. We shall shortly quote the question, but before doing so mention the following facts. Thorn-

ton was a deputy sheriff of Douglas county, and on December 9, 1935, at about 11:30 a. m., arrested the plaintiff, charging him with having committed the crime of assault and battery upon the defendant, Mrs. Leona Creason. The latter, Thornton and P. A. Webb, sheriff of Douglas county, were the defendants in the action, and are the respondents upon this appeal. The arrest was made without a warrant, the defendants claiming that the alleged crime was committed in the presence of Thornton. Immediately following the arrest, which took place upon a farm owned by Mrs. Creason, but under lease to the plaintiff, Thornton took the plaintiff to Roseburg and incarcerated him in the Douglas county jail. This occurred at 12:30 p. m. At the time of the arrest the plaintiff told his partner, Robert E. Benner, to "go and get Mr. Canaday". The latter is an attorney with a practice in Roseburg. Benner complied with the plaintiff's wish and shortly after the plaintiff reached the jail Mr. Canaday, in company with Benner, called upon him. Thornton, as a witness, delineated the circumstances of the alleged crime and the arrest. He testified that immediately after he had placed the plaintiff in the jail the plaintiff conferred for a few minutes with the defendant Webb, and that then Canaday and Benner appeared, whereupon Webb and Thornton withdrew. He swore that at about 3:30 or 4:00 p. m. he signed a complaint which charged the plaintiff with the aforementioned crime. In the meantime, according to Thornton, Canaday telephoned to him three times, at one time inquiring about the circumstances of the purported wrongful conduct, and at about 4:00 p. m., asking whether it would be agreeable to release the plaintiff upon his own recognizance. Thornton replied to the latter question that any determination made by the magistrate would be satisfactory to him. Thornton re-

turned to the jail at 5:30 or 6:00 p. m. and was surprised to see that the plaintiff had not been released. About 6:30 p. m. Canaday spoke to the plaintiff on the telephone. The next morning the plaintiff was brought into the courtroom and was released upon the deposit of $25 bail.

After Thornton had given the above testimony he was asked the question challenged by this assignment of error: "You anticipated that he (Canaday) would be over to go up with you when you took the defendant up?" Plaintiff offered the following objection to it: "That would be absolutely immaterial; as the supreme court has held it is the duty of the officer to take the prisoner before the magistrate and not the duty of the attorney or anybody else to hunt up a magistrate, and Mr. Canaday's relation to the matter does not affect the duty of the sheriff or his deputy." After the objection had been overruled Thornton completed his answer, stating: "Yes, I anticipated that Mr. Canaday would be here at the time Mr. Bowles was taken in to be arraigned." We shall later add more circumstances detailed by the testimony, but the above suffices for present purposes.

The plaintiff argues that the requirements of § 13-2021, Oregon Code 1930, which provides: "The defendant must in all cases be taken before the magistrate without delay" were violated in the course above described, and that any delay, beyond that which is permitted by the statute, constitutes unlawful imprisonment. Thornton contends that Canaday was the plaintiff's attorney, and that he (Thornton) was at all times ready and willing to take the plaintiff before a committing magistrate whenever Canaday got ready to proceed. He claims that the tardiness was due to Canaday.

Before disposing of the contentions attendant upon this assignment of error, we shall mention six more because, in our opinion, they are governed by the same legal principles that control the one under consideration.

The second assignment of error is predicated upon a ruling which permitted Thornton to answer the following question: "Were you ready and willing at any time that afternoon after the complaint was signed to take this defendant Bowles before the magistrate?" The objection was immateriality. Thornton's answer was in the affirmative.

The third assignment of error is based upon a contention that the court erred when it overruled the plaintiff's objection to the following question put to Thornton: "Did Mr. Bowles have an attorney representing him at all times from the first minutes after he was placed in jail?" The objection was similar to those already mentioned. The answer follows: "It was my understanding that upon Mr. Canaday's arrival at the jail that he was representing Mr. Bowles."

The fourth assignment of error challenges a ruling which permitted Mr. M. L. Hallmark, district attorney of Douglas county, to answer the following question: "Tell the jury what the fact is as to whether or not the complaint against Mr. Bowles was prepared by you in your office on the 9th of December, 1935." The material part of the defendant's objection follows: "We charge here as to the matter that Mr. Bowles was not taken before a magistrate as the law requires, and it is not a preliminary step to take a man before a magistrate and present a complaint. An affidavit or complaint can be made before the magistrate and any connection the district attorney's office had with this matter would be irrelevant and immaterial in this

case." After the objection had been overruled the witness answered "yes".

The fifth assignment of error is based upon a contention that the court erred when it overruled the plaintiff's objection to the following question submitted to the same witness: "And when was that complaint prepared?" The objection was the same as the above. Mr. Hallmark answered: "It was prepared on the afternoon of December 9, 1935. I can't give the exact time it was prepared, but it was between two and three or four o'clock—I think shortly after two, as I recall."

The sixth assignment of error takes exception to a ruling which permitted Mr. Hallmark to answer the following question: "And prior to preparing that complaint, what, if any, investigation or witnesses had you talked with?" The objection was, in part, the same as made to the two preceding questions, and in addition the following: "The acts between him and other people— third parties—is *res inter alios acta.*" The witness answered, "I talked to Clifford Thornton, the deputy sheriff, who made the arrest; and I also talked to Mrs. Creason; I am not absolutely sure that I talked to Mrs. Creason before I prepared the complaint, but it was all done about the same time." This question and answer immediately followed the one which constitutes the basis of the fifth assignment of error. In arguing against the plaintiff's objection, defendant's counsel stated: "I am trying to show * * * whether there was unreasonable delay—I was trying to show just what was done."

The seventh assignment of error deems erroneous a ruling which permitted Mr. Hallmark to answer the following question: "Was there any discussion between Mr. Bowles' counsel and you at that time concerning

what would be done with Mr. Bowles?'' Before any objection had been made the witness replied ''Yes. The main theme of the discussion was what Mr. Bowles' plea would be. At this point the plaintiff offered the following objection: ''It is irrelevant and incompetent, for the reason that it is not shown that Mr. Bowles was present or that anybody had authority to speak for him in this particular connection. * * * I would like to call the Court's attention further to the fact that there was no case in court; this complaint had never been filed and had never been taken before a magistrate.'' After these objections had been overruled the witness continued: ''Yes. We discussed the disposition of the case.'' In reply to a further question, to which no objection was offered, and which is not made the subject-matter of any assignment of error, Mr. Hallmark added: ''Mr. Canaday first stated to me that he represented Mr. Bowles and I told him what he was being charged with and he didn't seem to know just what to do about it, so I told him that if Mr. Bowles desired to enter a plea of guilty, that I would probably recommend leniency, or words to that effect; and he said that he didn't know what Mr. Bowles wanted to do about it, that he would have to talk with him first. He said he would go to the jail and talk to Mr. Bowles and come back later and tell me what they desired to do, and he did come back later, about an hour later, and we had a further discussion of the matter at that time. Mr. Canaday said that Mr. Bowles wouldn't plead guilty or didn't desire to plead guilty, and that he wanted to go to the office to look up the law, to see just where they stood.

''Q. Then after Mr. Canaday departed from your office with the statement that he wanted to go up to

his office and look up the law, did he return to your office any more that day? A. No, he didn't; I expected him to, but I didn't see him again; I didn't hear from him; we closed the office at five o'clock; he didn't make any further appearance that day."

It will be observed from the foregoing that the plaintiff believes it was the duty of the defendants to take the plaintiff before a committing magistrate whether or not his attorney had in mind a different program.

Before determining the merits of this contention, we add the following incidents taken from the evidence. As already mentioned, the plaintiff at the moment of the arrest told Benner, "Go and get Mr. Canaday." Benner did as requested. He testified: "Mr. Bowles had asked me to see Mr. Canaday and see what could be done. I said that I would. They started off and I followed them out. When I got to town it was shortly before noon so I went to Mr. Canaday's office." Benner reached Roseburg before Thornton, who was bringing the plaintiff, reached the city. We quote further from Benner's testimony: "When I got to town it was shortly before noon so I went to Mr. Canaday's office but he wasn't in. He was evidently out to lunch. When he got back I told him what had taken place on the ranch, and he said, 'We will go up and see what we can do.' We came to the court house and went to * * *." The plaintiff, referring to the same incident, swore that shortly after he had been lodged in the jail Canaday and Benner entered and remained conferring with him "about three-quarters of an hour to an hour." Mr. Canaday, as a witness for the plaintiff, testified that he had practiced his profession for 24 years and that "shortly after" the plaintiff was placed in the county

jail Benner called upon him. In the following narrative he described what he did following Benner's visit: "I told him (Benner) we would have to go over and find out what the trouble was. We came to the sheriff's office and asked for Mr. Thornton, as he had made the arrest, and Mr. Thornton was not in. Then the next place we went was to the office of Justice Marsters, the officer before whom the arresting officer would take his prisoner. At that time Mr. Marsters advised us that there was no complaint filed against Mr. Bowles. We could get no information there. Then we went to the district attorney's office and inquired for what the trouble was and he said it was claimed that Mr. Bowles had assaulted Mrs. Creason out there at the place, and we asked him about filing a complaint and he said, 'No, the complaint hadn't been filed' but that they would file it as soon as Mrs. Creason came in to sign it, as Mrs. Creason was going to sign the complaint and that they would file it as soon as that was done. Then we went to talk to Mr. Bowles up in the jail. I presume we were there an hour or more, talking with Mr. Bowles, and we presumed probably by that time the complaint would be filed against him. We came back to the district attorney's office and the complaint had not yet been filed, but Mrs. Creason, Mr. Thornton and another man were there in the office. I learned afterwards the other man was Mr. Bailey, and they were there when we came back after interviewing Mr. Bowles in the jail, and no complaint was filed, and we presumed from what the district attorney had stated that they would file it as soon as Mrs. Creason came in to sign it and that she was there for that purpose. At that time the district attorney said something about— I don't know his exact words—but he made the remark that it didn't look good for Mr. Bowles or looked bad

for Mr. Bowles or something like that; that Mrs. Crea-. son had a blue mark on her wrist, but he said that he didn't claim that Mr. Bowles put it there, but he said she had a blue mark on her wrist, and the complaint was not yet filed and he—I don't remember what was said—but he did say something about would Mr. Bowles plead guilty to assault or assault and battery, or something of the kind and Mr. Benner said, 'I don't know anything about it; that is up to Mr. Bowles; he will have to answer that' or words to that effect.

"Q. I understand this conversation took place in the absence of Mr. Bowles? A. Mr. Bowles was in jail at the time this conversation took place in Mr. Hallmark's office, the district attorney's office. Then we presumed that Mrs. Creason was there to sign the complaint, as the district attorney had said she was going to, so we went back to my office and I went to look up the law on the complaint—if the complaint would be filed right away, I would have an opportunity to take Mr. Bowles before the magistrate and get bail furnished for him. A little after that—just how long I don't recall—I called up Judge Marster's office and asked him for the second time if there was any complaint filed against Mr. Bowles and he said that there was not. Then I called the district attorney's office and got no reply to my telephone call, and after that I called and got Mr. Thornton and I told Mr. Thornton that there was no complaint filed against Mr. Bowles yet, and I said, 'I have got to do something to get Mr. Bowles out, so he can go home and look after the stock' and that was quite late in the afternoon, and Mr. Thornton made the reply—I don't remember his exact words—'Well, I will do whatever the judge says; whatever the justice says'—whichever words he might have used—'what-

ever he says, I will do. If he wants to furnish bail or something, I will do whatever the judge says.' Then I had no bail bond blank—not knowing what the bail would be fixed at—I came to your office and got a blank and immediately proceeded to Mr. Marster's office and he was not there and the office was locked. Knowing that when he goes from his office to the postoffice usually and Mr. Benner stopped somebody in the corridor and asked if they had seen Mr. Marsters and they said 'no' but made the remark that he usually went to the postoffice, and so we went to find Mr. Marsters and didn't find him; he was not there. By my calling Mr. Marsters late in the afternoon I found that there was no complaint filed at that time, and when I called Mr. Thornton and he said he would do whatever the judge said about it; he didn't say anything about any complaint being filed, if there was one filed.

"Q. Did you pursue your search for Judge Marsters farther than what you have mentioned? A. Mr. Benner and I went to the postoffice and didn't meet him on the street coming or going and we waited at the postoffice a few minutes and he didn't come, and I said we would go to his house and get him. We went to Mr. Marsters' house; the house was dark and there was no one at home. I rang the door bell or rapped, whichever it was, but no one was there, so I went around to the garage and the car was gone, and I thought probably Mrs. Marsters, as she does sometimes, had gone downtown with the car and that we would meet them coming home, so we came back and went to the postoffice the second time and watched on each side of the street to see if we could see him anywhere but didn't find him. We went to Mr. Marsters' house the second time and

there was no one there. By that time it was getting quite late and Mr. Benner said that he couldn't wait longer, that he had to get home and care for the stock; and that is when I ceased my efforts to get bail for Mr. Bowles that afternoon. The justice couldn't be found.''

Upon cross-examination Canaday was asked, "You know now, as a matter of fact, that it (complaint) was filed before the justice left his office?" He answered, "He says it was and I believed it was, but it was filed so late that we couldn't get the justice; couldn't find him." Thornton swore that Mr. Canaday had not requested that the defendant be brought before the magistrate for the purpose of giving bail, but admitted "I knew, of course, that he wanted to be released and I fully expected he would be released * * * there were other deputies in the office that could have taken Mr. Bowles into court upon a request." In answer to a question upon cross-examination which asked why the plaintiff had not been brought that afternoon "before a magistrate where he could have given bail," he replied, "I can explain that by saying that where a defendant is in our custody and he has employed counsel, that we never take them into court without counsel being present and we wouldn't be permitted to; the court wouldn't permit us to make an arraignment without counsel being present * * * there never has been a prisoner taken into court without an attorney where he has employed one." No one contradicted this statement. Shortly following this answer he was asked whether he knew that "when a man is arrested he must be taken without delay before a magistrate" and "why didn't you carry that out in the Bowles case?" He replied, "I was waiting for his attorney; in fact, I

wasn't waiting—the attorney could have come in to the office and demanded a hearing. Any other deputy could have gone to the jail and taken Bowles to the court. It wasn't necessary for me to be there.'' He shortly explained that when he employed the term ''arraignment'' in the above-quoted answers, ''I used it in the meaning for the man to be brought before the magistrate.'' Immediately after he had signed the complaint charging the plaintiff with assault and battery, he took a prisoner by the name of Moore before the justice of the peace, and upon cross-examination, replied that he didn't take the plaintiff at the same time ''because Mr. Canaday wasn't here. * * * I assumed he knew the complaint had been filed.''

Mr. Hallmark, who was the county's district attorney at the time the above events occurred, swore that upon Mr. Canaday's first visit ''he stated to me that he had been retained by Mr. Bowles to represent him in his defense of this crime.'' He then testified, ''I told Mr. Canaday that Mr. Bowles would be charged with assault and battery. * * * The main theme of the discussion was what Mr. Bowles' plea would be.'' In answer to further questions, he added that Canaday ''did not seem to know just what to do about it, so I told him that if Mr. Bowles desired to enter a plea of guilty that I would probably recommend leniency * * * and he said that he didn't know what Mr. Bowles wanted to do about it, that he would have to talk with him first * * *.'' He swore that about an hour later Mr. Canaday returned, stating that ''Mr. Bowles would not plead guilty or didn't desire to plead guilty, and that he wanted to go to the office to look up the law, to see just where they stood.'' He was positive that before the second visit a complaint had been prepared and that

"there was no request made that he (plaintiff) be brought in and bail set or that he be arraigned at that time. It is always a matter that depends on counsel after a man is represented by an attorney. We never take that man in until his attorney wants him taken in." No one took issue with that statement. Mr. Canaday, in a measure, vouched for the same rule of practice by his answer to the following question: "You didn't expect your client to be taken before the justice without you being present, did you?" He replied: "I didn't think he would; * * *" Upon cross-examination, Hallmark swore, "I was waiting for Mr. Canaday to get ready. I was ready at any time." Concerning the purported agreement for delay, he declared, "That was not expressed, but it was understood." We again quote from him: "On the first visit there was that conversation and he wanted to talk to Mr. Bowles and see what he wanted to do about it, and on the second visit he wanted to go to his office and look up the law, and I assumed, since he stated that he wanted to go to the office and look up the law, that he wanted to do that before he appeared in court." He was then asked, "He didn't say that, however?" and replied, "He didn't say it in those exact words, 'I don't want to go in right now'; that was certainly implied and understood." Upon rebuttal Mr. Canaday gave his version of his conversations with Mr. Hallmark. He believed that leniency and a plea of guilty were not mentioned upon the first visit but upon the second. He was sure that a complaint had not been filed at the time of his second visit, and said, "I went back to my office and we waited for that to be filed." He also declared, "I told Mr. Hallmark that I wanted to get Mr. Bowles out of jail so he could get home and look after the stock * * *. I told him that I wanted to bring the matter

up and get bail fixed so he could go home * * * I wanted to have the complaint filed with the justice's court so we could have bail fixed and there wasn't any complaint filed for hours.''

■ Although the second assignment of error challenges the ruling which permitted Thornton to say that, following the signing of the complaint, the plaintiff was represented by an attorney, it will be observed from the foregoing review of the evidence that both Benner and the plaintiff had already stated that fact. Both had freely and voluntarily testified upon direct examination that immediately following the arrest the plaintiff authorized Benner to employ Mr. Canaday and that the latter thereupon promptly proceeded to discharge the duties thus assumed. Both Benner and the plaintiff gave this testimony before the defendants presented their defense. Likewise, the plaintiff, Benner and Canaday had described in complete detail, step by step, the services which he had performed. Clearly this assignment of error possesses no merit.

■■ Under the circumstances, an inference was well justified that Mr. Canaday had authority to represent the plaintiff in all of the matters above mentioned: 5 Am. Jur., Attorney-at-Law, p. 307, § 80. Therefore, the acts and omissions of the attorney were the acts and omissions of the plaintiff: 5 Am. Jur., Attorneys-at-Law, page 305, § 78.

The plaintiff claims, not only that he had done no wrong which could have served as the basis of an arrest, and that, therefore, the arrest was illegal, but also that he was detained in jail longer than § 13-2021, Oregon Code 1930, permitted, and that, therefore, even if the arrest was justifiable the tardy release gave him a cause of action. In *Bowles v. Creason,* supra, the de-

cision construes the section of our laws just mentioned, which states: "The defendant must in all cases be taken before the magistrate without delay." Whether the other six of the above-mentioned assignments of error possess merit is dependent upon (a) whether the evidence indicates that the defendants were responsible for the delay which rendered it impossible to bring the plaintiff before Judge Marsters before he closed his office for the day; and (b) whether § 13-2021 demands that an arrested person be taken before a magistrate even though he or his counsel desire otherwise. For the sake of clearness we add that we are now concerned solely with the admissibility of the challenged testimony.

▮▮ It is true that Mr. Canaday did not expressly request delay, but the prevailing practice, as described by the uncontradicted testimony of both Thornton and Hallmark, required that prisoners who had employed attorneys should not be brought before the court in the absence of their counsel. The jury could properly have assumed that Mr. Canaday was familiar with this practice, especially since he did not claim to be unfamiliar with it. Since, under this rule of practice the client would not be brought before the magistrate in the attorney's absence, and since Mr. Canaday did not ask that the plaintiff be brought into court—although in the course of the afternoon he twice conferred with the district attorney—an inference was permissible that he was not ready to proceed. Such an inference, although not the only possible one, would be in harmony with the following circumstances: (a) Mr. Canaday first endeavored to acquaint himself with the facts of the case; (b) next, he listened to the district attorney's proposal of a recommendation of leniency upon a plea of guilty, which, however, the plaintiff rejected when

Mr. Canaday told him of it; (c) he retired to his office where he investigated the law applicable to the charge; (d) he repaired to another office where he secured a bail bond form; and (e) he then went to Judge Marsters' office, accompanied by Benner, evidently for the purpose of having the size of the undertaking fixed, of having the bond executed, and of having his client released. The door, however, was locked when he got there, and the justice had left for the day although he had been there only a few moments previously. An inference can reasonably be drawn that this was the first time that Mr. Canaday was ready to proceed. At the giving of bail it was not necessary that the plaintiff should be present.

From 5 C. J., Arrest, p. 430, § 71, we quote:

"It is the duty of an officer after making an arrest, either with or without warrant, to take the prisoner, within a reasonable time, before a justice of the peace, magistrate, or other proper judicial officer having jurisdiction, in order that he may be examined and held, or dealt with as the case requires. It is sometimes said that this must be done immediately, or forthwith, or without delay. These requirements mean no more than that it must be done promptly and within a reasonable time under all the circumstances. The officer may detain the person arrested in custody a reasonable time until he can conveniently and safely take him before a magistrate, when the circumstances preclude an immediate examination, hearing, or trial * * *."

From 4 Am. Jur., Arrest, p. 49, § 70, we quote:

"An officer or a private individual who has made an arrest of a person without a warrant has authority to detain him in custody only for such time as may reasonably be necessary to procure a legal warrant * * * or until a preliminary hearing of the charge against him can be had. * * * When, however, the

delay is occasioned by the conduct of the person arrested, the officer is not liable to that person for breach of his duty in that respect. The person arrested may waive his right to an immediate examination.''

From *Richardson v. Dybedahl et al.*, 14 S. D. 126 (84 N. W. 486), we quote:

''If appellants did not cause the plaintiff's arrest, of course, they are not liable in any view of the case. But if they did cause her arrest, although there was probable cause for so doing, the arrest was originally legal, a further issue arises,—as to whether the conduct of the deputy sheriff subsequent to the arrest was such as to render him liable, and, if so, whether appellants are responsible for such conduct. It was the duty of the deputy sheriff to take the plaintiff before a magistrate without unnecessary delay. Comp. Laws, § 7133. If, however, a person under arrest requests delay, or desires to be taken before some magistrate other than the one nearest and most accessible, and the officer complies with such request, neither he nor one who advises him in so doing can be held liable for false imprisonment.''

From *Wood v. Olson*, 117 Ill. App. 128, the following is taken:

''While there is evidence tending to show that the failure to take appellee into court was occasioned by his neglect to respond when his assumed name was called at the jail, there is also evidence which would warrant the jury in finding that the delay was occasioned by the fact that a large number of persons were named in the writ and that those who were willing to plead guilty were first given attention. Having in his custody, citizens who were, in the eyes of the law innocent of any crime, it was the duty of appellant, without unnecessary or unreasonable delay, to afford each and all of them an opportunity to be heard or give bail, even if to do so it became necessary for him to procure the aid of additional deputies.

"We are unable to say that the jury was not warranted in finding that the detention of appellee in jail until the second morning after his arrest, without examination or hearing, was an unreasonable delay under all the circumstances, and such as to render appellant liable for false imprisonment under the second count of the declaration."

See to the same effect: *Clark v. Tilton*, 74 N. H. 330 (68 Atl. 335), and *Keefe v. Hart*, 213 Mass. 476 (100 N. E. 558; Ann. Cas. 1914A 716) (annotated).

■ Generally, whether the detention was for an unreasonable time, and therefore in violation of statutes of the above type, is a question for the jury: *Harris v. Atlanta*, 62 Ga. 290; *Venable v. Huddy*, 77 N. J. Law 351 (72 Atl. 10); *Schoette v. Drake*, 139 Wis. 18 (120 N. W. 393); *Wood v. Olson*, supra. In *Oxford v. Berry*, 204 Mich. 197 (170 N. W. 83), the court enumerates many of the circumstances which determine the reasonableness of the period of detention.

■ It is our opinion that the challenged testimony was material. If believed it was capable of accounting for the delay in the plaintiff's release. Without it the sheriff and his deputy had no justification for their failure to bring the plaintiff promptly before Judge Marsters. This testimony permitted, although it did not require, the jury to infer that, with the acquiescence of plaintiff's counsel, his appearance before the magistrate was delayed until the attorney was ready to proceed. In stating the circumstances in the above manner we mean no reflection upon Mr. Canaday. Since we are now concerned only with the admissibility of the testimony, we have omitted mention of other matters which, possibly, indicate that Mr. Canaday was not at fault.

The eighth assignment of error is predicated upon a requested instruction (designated as No. 1) which the

circuit court gave only in part. Appellant's brief states: "It is true that a part of requested instruction No. 1 was given to the jury." In the other trial a similar request was before this court. Concerning the omitted part, which was substantially similar to the remainder of the instruction now before us, our decision stated: "The rest of the instruction requested is objectionable on the ground that it would tend to mislead the jury in regard * * *." We still believe that the part which the circuit court rejected was misleading. In our opinion, this assignment of error possesses no merit.

The ninth assignment of error is based upon the refusal of the circuit court to give to the jury another of plaintiff's requested instructions. Concerning a similar request, this court, in the first appeal, said: "This assignment of error is based on the refusal of the court to give a requested instruction of the same tenor and purport covered by assignment of error No. 7." which is the one mentioned in the last paragraph. The decision states: "What we have said in relation to assignment No. 7 applies with equal force to this assignment." It is unnecessary, in our opinion, to say anything more except that the trial judge, in well-chosen language, imparted to the jury the legal principles governing this assignment of error, and to which Mr. Justice CAMPBELL adverted in our decision (*Bowles v. Creason,* supra) when he said: "We think that plaintiff would be entitled to an instruction to that effect." We find no merit in this assignment of error.

The tenth assignment of error complains because another of plaintiff's requested instructions was not given as requested, but in amended form. The request follows:

150

"It is claimed on behalf of defendants that the plaintiff was arrested for committing an assault in the presence of the officers who arrested him. It is the duty of an officer arresting a person without a warrant for an offense alleged to have been committed in his presence, to take the person arrested without delay before some magistrate, to be charged with the alleged offense by affidavit or sworn complaint. If this requirement of the law is not met, then there is no authority for holding the person arrested. If the officer claiming to have arrested a person for an offense committed in his presence shall fail to take the person so arrested before a magistrate, as soon as he can reasonably do so, then the person making the arrest is liable in an action for damages."

Plaintiff's brief states that this requested instruction "was given substantially" and finds no fault with the slight changes in phraseology which the trial judge made. The plaintiff complains, however, because the following was added:

"If you find from the evidence that the plaintiff Bowles was represented by an attorney within a short time after his restraint in jail, and that any delay, if you find there was delay, in taking the plaintiff before a magistrate was caused by or due to acts of plaintiff's attorney, then you may take such fact, if you find it to be a fact, into consideration in determining whether or not the officers complied with the provision of the law to which I have just called your attention; that is to say, the provision of the law requiring the taking of a prisoner before the magistrate without delay."

The principles of law to which we alluded, in holding that the challenged testimony concerning Mr. Canaday was admissible, sustain this amendment to the instructions.

■ The eleventh assignment of error states that the following requested instruction was not given to the jury:

"I instruct you that where more than one person takes part in a false arrest and false imprisonment, each person who participates is liable in damages to the person injured and it is not necessary that each person should have been participating from the beginning or that each should participate throughout the affair, but each one who contributes to the unlawful arrest and imprisonment at any state thereof is liable."

The instruction was given in those precise words with the exception that the trial judge used the word "when" in the first line where the plaintiff requested the use of the word "where"; omitted the phrase "at any stage thereof" occurring near the end; substituted "or" for "and" in the couplet "false arrest and false imprisonment"; and near the end inserted the word "unlawful" before the word "imprisonment." The changes were improvements. They do not constitute error.

■ The twelfth assignment of error is based upon a contention that error was committed when the trial judge substituted for plaintiff's requested instruction No. 11 one phrased by himself. The same charge occurred in the previous trial, and concerning the substituted instruction our decision states: "It correctly states the law as applied to the facts in the instant case." This assignment of error possesses no merit.

■ The thirteenth assignment of error challenges the refusal of the trial judge to give to the jury an instruction prepared by the plaintiff concerning the burden of proof. In the previous trial the same requested instruction was before this court; our decision described it thus: "quite complex, complicated and subject to criticism of duplicity." We held no error was committed when the request was denied. The same conclusion is authorized in the present instance. The court's instruc-

tion upon the burden of proof, in our opinion, was adequate. We find no error disclosed by this contention.

The fourteenth assignment of error is based upon the refusal of the trial judge to charge the jury as follows:

"I instruct you that under the law of this state any person arrested must be taken before a magistrate without delay, where he can be charged with the crime for which he was arrested, by affidavit or complaint. (Sec. 13-2021 Oregon Code 1930). In considering this phase of the case you should take into consideration the evidence as to the location and accessibility of a magistrate, and the action or failure of action on the part of the arresting officer in seeking such magistrate with his prisoner. It was the duty of the officer to hunt up the magistrate, and not the duty of the plaintiff or his attorney to do so. The duty of the arresting officer in this connection is not fulfilled by taking the prisoner before the district attorney. Failure of the officer, without reasonable ground, to perform his duty in this respect makes him liable in damages to the arrested person, and you are to consider the evidence in order to determine whether or not that duty was performed 'without delay,' as required by law.'"

The instruction actually given follows:

"The law imposes a mandatory duty upon every officer making an arrest without a warrant to without delay bring the person arrested before a magistrate where he can be charged, by affidavit or complaint, with the crime for which he was arrested; and the officer must exercise reasonable diligence and put forth some effort to carry out this mandate of the law. The duty on the part of the officer would not be complied with by taking the prisoner before the district attorney. It is, of course, not the duty of the prisoner or his attorney to hunt up a magistrate. By the term 'without delay' is meant within a reasonable time, taking into consideration all of the facts and circumstances of the case. If you find from the evidence that the plain-

tiff was arrested for a violation of the law committed in the presence of one or both of the officers and was restrained in jail, then the arresting officer had a reasonable time thereafter within which to file a complaint with and take the plaintiff before a magistrate. In determining what was a reasonable time for such purpose, you must take into consideration all of the facts and circumstances of the case shown by a preponderance of the evidence before you. If you find from the evidence that the plaintiff Bowles was represented by an attorney within a short time after his restraint in jail, and that any delay, if you find there was delay, in taking the plaintiff before a magistrate was caused by or due to acts of plaintiff's attorney, then you may take such fact, if you find it to be a fact, into consideration in determining whether or not the officers complied with the provision of the law to which I have just called your attention; that is to say, the provision of the law requiring the taking of a prisoner before the magistrate without delay.''

■ The plaintiff criticizes the part which states that after the officer had placed the plaintiff in jail the officer had a reasonable time within which to repair to the district attorney's office for the preparation of the complaint. He argues that the officer should have taken him directly to the magistrate. According to our information, it is the general practice in this state for the officer who takes into custody the arrested person to lodge the latter in jail while he proceeds to the prosecuting attorney's office and secures a complaint. The uncontradicted testimony indicates that that practice is followed in Douglas county. We believe that it is not out of harmony with the requirements of § 13-2021, Oregon Code 1930, previously quoted, and we also believe that the authorities previously cited sustain the practice. That being true, we find no error revealed by this contention.

■ The fifteenth assignment of error is based upon the refusal of the trial judge to give to the jury requested Instruction No. 15. It concerns the liability of the defendant sheriff Webb for the acts of his deputy, the defendant Thornton. In our opinion, it is highly argumentative. Had it been given, the jury could readily have believed that the judge was attempting to argue them into a finding against the sheriff. It is our belief that the instructions given served every legitimate purport of this requested instruction. In a preceding paragraph we quoted an instruction given which informed the jury that if the arrest and imprisonment were not authorized by law all defendants who participated therein were liable to the plaintiff in damages. This assignment of error possesses no merit.

■ The sixteenth assignment of error is based upon another requested instruction. Its contents were not given in language chosen by the plaintiff, but in words which were suitable. When a legal principle has once been stated to the jury in language which they can grasp, repetition is not necessary.

The seventeenth assignment of error is predicated upon the court's refusal to instruct the jury:

"If you find from the evidence that the defendant Creason directed the defendant Thornton to arrest the plaintiff Bowles, without warrant, and lock him up, and that defendant Thornton did so and requested defendant Creason to come to the court house and sign a complaint against plaintiff and she failed to do so after reasonable opportunity, and thereby caused the imprisonment of plaintiff to be prolonged, so that plaintiff was held in jail for an unreasonable time, then I instruct you, defendant Creason is chargeable with contributing to such wrongful imprisonment."

The instruction which was given follows:

"If you find from the evidence that the defendant Leona Creason wrongfully requested and directed the officers, Thornton and Perry, or either of them, to arrest and confine plaintiff in the county jail and if you further find that the acts of arresting and confining the plaintiff in the county jail were wrongful and unlawful, then the defendant Creason is liable for the resulting damages to the plaintiff due to such false arrest and false imprisonment, although she may not have taken any physical part in the arrest or imprisonment of the plaintiff.

"If you should find that the arrest of the plaintiff by the defendant Thornton was unlawful, then you may find against the defendant Thornton, or against the defendant Thornton and the defendant Creason; or if you find that the arrest by the defendant Thornton was lawful, but that the detention of said plaintiff by the defendant officers was unlawful, then you may find against the defendants Webb and Thornton; or if you should find from the evidence that both the arrest and the detention were unlawful, then you may find against all three of the defendants. But in no event can you find against the defendant Creason alone."

█ The instruction which the plaintiff sought is based upon an assumption that Thornton, by requesting Mrs. Creason to sign a complaint against the plaintiff, could thereby render it her duty to do so, and that her failure to do as requested would create a cause of action in favor of the plaintiff. We are satisfied that if Mrs. Creason owed a duty to sign a complaint against the plaintiff, the duty arose from the demands of legal principles and not from any disobedience of the request. The circuit court did not, in our opinion, err when it refused to give the requested instruction.

The eighteenth assignment of error challenges the concluding sentence of the instruction just quoted. The plaintiff calls attention to the fact that all persons

taking part in a false arrest or false imprisonment, however numerous they may be, are liable both jointly and severally to the wronged person for the full amount of the damages resulting from the wrong. The following decisions and texts cited by the plaintiff illustrate the application of this principle: *Bingham v. Lipman, Wolfe & Co.*, 40 Or. 363 (67 P. 98); *Knight v. Baker*, 117 Or. 492 (244 P. 543); *Strauhal v. Asiatic Steamship Co.*, 48 Or. 100 (85 P. 230); Cooley on Torts (4th Ed.) §§ 75, 76, 77, 81 and 85. Based upon this legal principle, the plaintiff claims that the trial judge erred when he told the jury: "But in no event can you find against the defendant Mrs. Creason alone." The first two of the above decisions concern actions for false imprisonment and the third an action for negligence. An issue in all three was whether judgments were recoverable against a part only of the wrongdoers. From *Bingham v. Lipman, Wolfe & Co.*, supra, we quote:

"And finally it is contended that the verdict is insufficient to support the judgment, because it is against the corporation only, and not against the other defendants, who are admitted to have been its managing agents, and through whose conduct it became liable, if at all. This apparent inconsistency was a proper subject for consideration by the trial court on the motion for a new trial, but it does not render the verdict void. The action is for tort, and the jury had authority to render a verdict against all or any of the defendants."

In *Knight v. Baker*, supra, this court said:

"If others than the defendant participated in the tortious acts, they also are liable to the plaintiff. The plaintiff is at liberty to sue all of the persons participating in the trespass against him, or he may elect whom of that number he shall sue."

In *Strauhal v. Asiatic Steamship Co.*, supra, the deceased had lost his life through the sinking of a barge

owned by one of the defendants, but under lease to the other. According to the decision, there was evidence "tending to show that the accident by which the deceased lost his life was caused by the concurrent negligence of the steamship company in loading and discharging the barge and of the lumber company in furnishing an unseaworthy barge." The decision held: "This brings the case within the established rule that where an injury is the result of the concurrent negligence of two or more persons, although acting separately, either or all are liable," and the injured party can make as defendants as many or as few of the wrongdoers as he chooses.

Pursuing the subject further, the plaintiff points out the distinction between a tort action in which the relationship of master and servant exists between the defendants and a tort action in which that relationship among the defendants is absent. The distinction is well stated in *Doremus v. Root*, 23 Wash. 710 (63 P. 572, 54 L. R. A. 649), where the relationship of master and servant existed between the defendants. We quote from the decision the following:

"It must be borne in mind, however, that there are wide distinctions between the ordinary action for injuries, where all of the defendants participated in the wrongful act which caused the injury, and actions like the one before us, where one is liable because he committed the act and the other by operation of law, both with respect to the relations of the defendants to each other and to the injured person. Joint tort feasors are liable to the injured person (other than that he may have but one satisfaction) as if the act causing the injury was the separate act of each of them, and they have, except in certain special cases, no right of contribution among themselves. But the defendants in this character of action are in no sense joint tort feasors, nor does their

liability to the plaintiff rest on the same or like grounds. The act of an employee, even in legal intendment, is not the act of his employers, unless the employer either previously directs the act to be done or subsequently ratifies it. For injuries caused by the negligent act of an employee not directed or ratified by the employer the employee is liable because he committed the act which caused the injury, while the employer is liable not as if the act was done by himself, but because of the doctrine of *respondeat superior,*—the rule of law which holds the master responsible for the negligent act of his servant committed while the servant is acting within the general scope of his employment, and engaged in his master's business. The primary liability to answer for such an act, therefore, rests upon the employee, and when the employer is compelled to answer in damages therefor he can recover over against the employee. * * * So, where the employer is sued separately for the wrong, he can bind the employee in any judgment that may be obtained against him by notifying the employee to come in and defend the action. * * * So, also, in such an action, whether brought against the employer severally or jointly with the employee, the gravamen of the charge is, and must be, the negligence of the employee; and no recovery can be had unless it be proved, and found by the jury, that the employee was negligent. Stated in another way; if the employee who causes the injury is free from liability therefor, his employer must also be free from liability."

In *Emmons v. Southern Pacific Co.*, 97 Or. 263 (191 P. 333)—an action to recover damages against a railroad company and a conductor in its employ—the plaintiff claimed that the conductor had negligently operated the company's car and had thereby caused his injury. The verdict was against the company alone; it made no mention of the conductor, but was construed as a verdict in favor of the latter. Based upon it a judgment was entered against the company alone which was reversed upon appeal. The decision, after referring

to *Doremus v. Root*, supra, pointed out that the railway company and its conductor were not joint tort feasors, that the conductor was primarily liable and the company successively, and that the company's liability rested upon the principle of *respondeat superior*. Since the conductor had not been found to be at fault "the result is," said the decision, "that the judgment of the circuit court must be reversed."

In the present instance, the liability of none of the defendants is successive, nor is the liability of any one of them dependent upon the doctrine of *respondeat superior*. If any liability whatever exists upon the part of any one of them, it is due to the fact that he participated in the alleged wrong. Therefore, the plaintiff argues that Mrs. Creason may be liable, although the other two defendants may be found to be free of fault.

The following additional facts possibly need statement. The complaint charges that the defendants Thornton, Mrs. Creason, and one Fred Perry formed a conspiracy to enter upon the plaintiff's property and to take therefrom wrongfully a team of horses. It further charges that in proceeding with their wrongful design the arrest of the plaintiff was made. The defendant Webb is charged with liability because of his official position and also by reason of an averment that he detained the plaintiff in jail wrongfully after being acquainted with the facts. At the beginning of the trial the plaintiff dismissed his action as to Perry. The testimony is uncontradicted that the arrest was made by Thornton. No one claims that Mrs. Creason arrested the plaintiff or even touched him; to the contrary, both she and Thornton swore that he grabbed and twisted her arm. The plaintiff denied this testimony, and contends that the arrest was made without cause and that Mrs.

Creason directed that it be made. Thornton and Mrs. Creason testified that after the alleged assault the plaintiff remained immediately alongside of Mrs. Creason in a threatening, menacing manner and refused to stand back when directed. At this point, according to the testimony of these two defendants, Thornton asked Mrs. Creason whether she desired that an arrest be made for what had just taken place and received an affirmative reply. After the arrest Thornton took the plaintiff to the county jail, requesting Mrs. Creason to go to the district attorney's office and sign a complaint. She went as requested, but the complaint was prepared for Thornton's signature. He signed it.

■ Drawing from these facts the inferences most favorable to the plaintiff, she conspired with the other defendants, she went to the plaintiff's farm, she directed that the arrest be made, and she refused to sign a complaint. But such action, if it occurred, and such motives, if they existed, unaccompanied by the action of others, could not get the plaintiff into jail. Had nothing more than these enumerated acts occurred, the plaintiff would never have been placed in jail, and the present action could not have been brought. It was Thornton who made the arrest, and it was his hand clasped about the plaintiff's arm that led the latter to the jail. Any finding that Thornton's conduct was not wrongful, but was justified, necessarily exculpates Mrs. Creason also. If the plaintiff's charges are true, Mrs. Creason and Thornton were joint tort feasors and both were jointly and severally liable for the wrong done. The very authorities upon which the plaintiff relies (cited in a previous paragraph) indicate that unless Thornton was liable Mrs. Creason could not be liable. See our quotation from *Bingham v. Lipman, Wolfe & Co.*, supra, set

forth in a preceding paragraph, and, in addition, see *Dare v. Boss*, 111 Or. 190 (224 P. 646) ; *St. Louis & S. W. Ry. Co. of Texas v. Thompson,* 102 Tex. 89 (113 S. W. 144, 19 Ann. Cas. 1250). From the first of these two decisions the following has been taken:

"But there is one proposition that makes it necessary to reverse this case, and that is the fact that the jury, in effect, had found Pridgeon, who was driving the car by permission of Little, not guilty of negligence in crashing into plaintiff's car, or at least has failed to find on that subject. There could be no negligence except that imputed from the relationship of the parties, and, unless Pridgeon was negligent, no negligence could, under any circumstances, be imputed to the defendant company. That is to say, if the collision was without negligence on the part of the driver of the car, it could not be negligence on the part of anyone else. To say that Pridgeon was not negligent is to say that nobody in charge of the car was negligent, because it was his hand steering the car, and whatever injury occurred, if any, for which anybody was liable must have been through his agency; and this is sustained by all of the authorities."

The mere fact that the relationship of master and servant did not exist between the defendants and that, therefore, the doctrine of *respondeat superior* did not render the one responsible for the other's acts, is no indication that Mrs. Creason could be liable to the plaintiff for his arrest if Thornton was justified in making it. The principle of law known as respondeat superior is a means whereby one person may be liable for another's tort even though the two were not joint feasors. If the one was the employer of the other and had authorized, or later ratified, the commission of the wrong, he is liable for its consequences. That doctrine does not concern us now. The plaintiff's claim is that Mrs. Creason can be liable for the arrest upon a complaint averring that it was the wrongful result of

a conspiracy, even though the jury should find for the officer upon his plea that the facts which he observed warranted him in making the arrest. It is our belief that the plaintiff charges a set of circumstances under which Mrs. Creason could not be liable unless Thornton was likewise liable. And that being true, the jury was no less bound by the legal principles resulting in that conclusion than the judge who presided over the trial. There is no law which does not operate with equal force upon both jury and judge. Therefore, no error could be committed in stating the legal principle to the jury. It is true, as the plaintiff suggests, that he could have sued Mrs. Creason alone, or that he could have dismissed his case as to the defendants Thornton and Webb. However, he did not do so, and, under the circumstances as they existed when the cause was submitted to the jury, the instruction that Mrs. Creason could not be liable unless Thornton was also liable was a correct statement of the law.

*Burroughs v. Eastman*, 101 Mich. 419 (59 N. W. 817, 24 L. R. A. 859, 45 Am. St. Rep. 419, and *Sparrow v. Bromage*, 83 Conn. 27 (74 Atl. 1070, 27 L. R. A. (N. S.) 209, 19 Ann. Cas. 796), upon which the plaintiff relies to support his criticism of the portion of the instructions under attack, do not sustain his position, in our opinion. In the first of these two decisions the facts were: The plaintiff had been arrested without a warrant for violation of a Sunday closing ordinance. The arrest, being made without warrant, the court held that it was unlawful. The arrest was made by one of the defendants, a lieutenant of police, named Hurley, under the direction of the other defendant, Eastman. The verdict was against the latter only. We now quote from the decision:

"Appellant also contends that the verdict of the jury finding the defendant guilty should not be allowed

to stand because of the inconsistency in the verdict rendered. The actual arrest, which was made by the direction of the defendant Eastman, was made by one Hurley, lieutenant of police. Hurley was joined with defendant Eastman, and upon the trial Eastman was found guilty, and Hurley not guilty. It does not appear whether the plaintiff has rested content with the verdict in favor of Hurley, but, while it may be that the jury rendered an inconsistent verdict, it does not follow that defendant Eastman can take advantage of it. The plaintiff could have *nolle prosequied* the case as against Hurley at any stage, and have proceeded to try the issue as against Eastman. The plaintiff might, after verdict, have moved for a new trial as against defendant Hurley, and a different result might be reached on another trial. We think the point should be overruled.''

In *Sparrow v. Bromage,* supra, a verdict of $800 had been recovered against two defendants, one of whom, Bromage, was chief of police, and the other, Moore, was a patrolman. A motion filed by the defendants seeking a new trial upon the ground that the verdict was excessive and against the evidence was granted as to Moore. Then judgment was entered against Bromage for $800. Bromage next appealed upon the ground, according to the decison, that ''it cannot be said that any judgment, or at least one for so large an amount, would have been rendered against him as a sole defendant.'' In sustaining the judgment, the decision stated:

''But it is said that possible harm might result to those against whom a judgment is thus rendered, for the reason that they might be held charged with responsibility for the acts shown in evidence of those who are allowed to escape from the consequences of the finding of the jury, upon the ground that a case had not been made out against them. A situation in which this would be possible would not be the usual one. It could only arise where a failure to satisfactorily establish a claimed joint action by tort feasors was a factor in it. In such case, where harm of the kind suggested might be

reasonably anticipated if a verdict was permitted to stand against only a part of the defendants unsuccessful before the jury, it is to be presumed that the court would exercise its authority to prevent the injustice, and order a new trial as to all thus threatened with injury. See Washington Gaslight Co. v. Lansden, 172 U. S. 534, 556, 43 L. ed. 543, 552, 19 Sup. Ct. Rep. 296. But such a situation is by no possibility present in this case. Whether the facts as claimed to have been established by the plaintiff or by the defendant be accepted, it is beyond question that, if the defendant Moore performed any act of detention within the purview of the complaint, he performed it under the authority of Bromage, his superior, and in direct cooperation with the latter. They were inevitably joint actors in so far as Moore acted at all in the perpetration of the wrong of which the plaintiff complains. Such being the case, no harm could possibly accrue to the appellant by the action of the court. If Moore did not participate in the plaintiff's arrest and detention, there was nothing for the appellant to be charged with on Moore's account. If he did participate, then the appellant would be rightfully held responsible for the consequences of his co-actor's acts, and he can be no more injured by Moore's escape, whether right or wrong, from a judgment, than he would have been had Moore not been joined in the action.''

A situation quite similar to that of those two cases was before us in *Hise v. City of North Bend*, 138 Or. 150 (6 P. (2d) 30), in which a judgment in a negligence action had been recovered against the city upon a verdict against the latter, but in favor of the city officials charged by law with the duty of attending to the matter out of which the alleged condition arose. The city, but not the plaintiff, appealed. The judgment was sustained.

Nothing contained in these decisions is out of harmony with the part of the attacked instruction which states: ''In no event can you find against the defendant Creason alone.'' That instruction is correct, regardless

of whom it may now appear to favor or disfavor. Instructions should not be given as favors to either party; but all legal principles should be stated to the jury in the form of instructions which are necessary to promote the ends of justice and obtain verdicts in accord with the law. Possibly, if the verdict had been against Mrs. Creason but in favor of Thornton, difficulties might have been encountered, as in the three cases above cited, in saying that the attacked instruction was ignored. It is always easier to state a legal proposition in the form of an instruction than to be sure after verdict that the jury violated it. After verdict the courts are compelled to presume that the jury properly found the facts and correctly applied the instructions. In the jury room the law and the facts are rolled up in, or, to use a different term, concentrated in the verdict, and the latter is virtually the sole evidence of the manner in which the merger was effected. Therefore, the party who claims that the law was improperly applied, or that the evidence does not sustain the verdict, is compelled to view the evidence in the light most favorable to his opponent, and is also required to assume that the jury properly understood the instructions. But before verdict, the trial judge is not confronted with such a one-sided proposition. He gives to each side the benefit of the most favorable view of the evidence of which it is capable and then fashions his instructions accordingly. The instruction of which the plaintiff now complains was given in that manner. In all three of the above decisions the judgment was sustained after the courts had adopted a view of the evidence most favorable to the verdict, and had also reasoned that if the plaintiff got a judgment against one defendant only, when he was possibly entitled to a judgment against two or more, he, rather than the defendant, was injured thereby. Such

a view of the law was justified by the legal principle that after trial all reasonable inferences are drawn in favor of verdicts in an effort to avoid retrials. We find no merit in the plaintiff's criticism of the above-quoted portion of the instruction.

Assignment of error No. 19 is substantially similar to assignment No. 20 upon the previous trial. Concerning it the decision stated: "No. XX is a summation of defendant's theory of the case. The subjects of arrest, assault and battery, and unnecessary delay in taking an accused before a magistrate have been fully considered in this opinion, and it is not necessary to discuss them further." We have, however, considered the plaintiff's additional arguments, but believe that they lack merit.

Assignment of error No. 20 is based upon an instruction concerning the plaintiff's representation by an attorney while he was confined in the jail. We have stated in preceding paragraphs our understanding of the law concerning these contentions. We find this assignment of error to be without merit.

Assignment of error No. 21 complains because the trial judge, in response to the jury's request, repeated one of the instructions concerning the plaintiff's representation by an attorney while confined in the jail. Before re-reading the instruction, the judge stated: "I might say to you further that it is the right of every person who may be charged with a criminal offense to have the advice and assistance of an attorney to represent him at all stages of any criminal proceeding." Based upon what has already been said, we believe that no error is revealed by these contentions.

The above disposes of all assignments of error. It follows that the judgment of the circuit court is affirmed.

BEAN, C. J., and KELLY and BELT, JJ., concur.