Argued March 11, 1958, reversed and remanded February 11, 1959

# WIEBE *v.* SEELY, Administrator
# WIEBE *v.* PIASECKI
### 335 P. 2d 379

332

*William H. Morrison,* Portland, argued the cause for appellants and cross-respondent. On the briefs were Maguire, Shields, Morrison & Bailey and Howard K. Beebe, Portland, and Asa L. Lewelling, Salem.

*Allan G. Carson* and *Thomas W. Churchill,* Salem, argued the cause for respondent and cross-appellant. On the brief were Carson, Carson & Gunnar and Thomas W. Churchill, Salem.

Before PERRY, Chief Justice*, and LUSK, BRAND**, WARNER, McALLISTER*** and SLOAN, Justices.

LUSK, J.

These are appeals by the defendants from judgments for the plaintiff in two actions to recover damages for personal injuries which, by agreement of the parties, were consolidated for trial in the circuit court, and are likewise consolidated here.

The defendant in one case is Chris Seely, Administrator of the Estate of Edward K. Piasecki, deceased,

---

\* Chief Justice when case was argued.
\*\* Resigned July 1, 1958.
\*\*\* Chief Justice when case decided.

hereinafter referred to as the Administrator, and in the other Kathryn A. Piasecki, widow of the deceased. Edward A. Piasecki died about nine months after the accident, and these actions were commenced some ten months after his death.

The jury returned a verdict against both defendants for $60,000. The court, guided by the limitation on the amount of the recovery in effect at the time of the accident in an action for personal injuries against the personal representative of a deceased wrong-doer, Oregon Laws 1949, ch 519, p 815①, entered judgment against the Administrator for $15,000 and against the defendant, Kathryn A. Piasecki, for $60,000.

The actions grew out of a collision between an automobile driven by the plaintiff and one driven by the deceased, which occurred about five o'clock on the morning of November 4, 1951, in the intersection of 12th and Mission Streets in the city of Salem. The plaintiff, a city policeman, was driving South on 12th Street on patrol duty. The deceased was driving East on Mission Street bound for his farm near Salem to hunt ducks. He was dressed for hunting, and his dog was in the back of the car, a Packard sedan. A dense fog severely limited visibility. The collision occurred in the Southeast quarter of the intersection, and the plaintiff sustained serious injuries. There is no question as to the sufficiency of the evidence of negligence charged in the complaint to warrant submitting the case to the jury as against the Administrator. It is

---

① "Causes of action arising out of injury to the person or death, caused by the wrongful act or negligence of another, shall not abate upon the death of the wrongdoer, and the injured person or the personal representatives of one meeting death, as above stated, shall have a cause of action against the personal representatives of the wrongdoer; provided, however, that the injured person shall not recover judgment except upon some competent satisfactory evidence other than the testimony of said injured person; and provided further, that the damages recoverable under the provisions of this Act shall not exceed fifteen thousand dollars ($15,000)."

contended, however, by the defendant, Mrs. Piasecki, that there is no evidence to support a judgment against her. The question was raised by a motion for a directed verdict, the denial of which is assigned as error.

Mrs. Piasecki is sought to be held on the theory that she was the owner of the Packard automobile driven by her husband, and that the car was kept and used for family purposes. She contends that she did not own the car, that the evidence shows as a matter of law that it was owned by Mr. Piasecki, and that in any event the family purpose doctrine is not applicable as between husband and wife.

*Ownership of the Packard Automobile.*

The evidence upon this subject is as follows:

A certificate of title to the Packard was issued by the Oregon Secretary of State on June 26, 1948, to Kathryn A. Piasecki. Mrs. Piasecki testified that she did not know that the title was in her name until after her husband's death, which occurred August 23, 1952, and that she did not sign any application of any kind in connection with the car. According to her testimony, the car was purchased by her husband in Portland. She identified a check dated June 18, 1948, in the amount of $4,540.19, payable to A. Piasecki and drawn by Edward K. Piasecki. She testified that the proceeds of the check were used to pay for the Packard, that A. Piasecki was Mr. Piasecki's sister, and that the check was made payable to her "Because she was a resident of Portland and Mr. Piasecki was not, and he couldn't purchase the car in Portland so his sister paid for it and then she sold the car to him." She was present when he gave the check to his sister.

Mrs. Piasecki owned a Cadillac, which she pur-

chased with her own money inherited from her mother. She paid for it with a check for $4,186.83, drawn by her on her personal account on October 8, 1951, to the order of Douglas McKay Chevrolet Company. The check is in evidence. She and her husband had always had two cars. At the time that the Packard was purchased, she owned a small Oldsmobile. Mrs. Piasecki testified that she never drove the Packard, that it was equipped with a regular gearshift which required the use of a clutch pedal, and she had not driven that type of car since 1947 because of arthritis in her hip and knee, that the Cadillac had a hydromatic gear shift and no clutch pedal.

in going to and from his office, and was parked near The Packard was used regularly by Mr. Piasecki the office during the day. He had had the back seat taken out, and the back part of the car fixed up for his dog on his trips to his farm near Salem.

Mrs. Piasecki was called as an adverse witness by the plaintiff and examined about the ownership of the Packard. She was shown photostats of the face and back of the certificate of title issued for the Packard. On the face of the certificate the name of the owner, "Kathryn A. Piasecki," is typed and the date of issuance appears as June 25, 1948. On the back is a printed form of "Assignment of Title by Registered and Legal Owner." Mrs. Piasecki's name is written on the line immediately below this language, followed by the date "5-28-52." Below this appears the admitted signature of Mr. Piasecki under the form for "Application for Title by New Owner." Mrs. Piasecki was asked by counsel for plaintiff whether these were the signatures of herself and Mr. Piasecki, and answered:

"A This is my signature typed [evidently referring to her name on the face of the certificate]

but I can't make out this lower one [referring to her name written on the back of the certificate].

"Q It is not too clear, but do you recall signing that title?

"A Well, I may have signed it, but I don't remember it."

When examined later by her own attorney, she testified that her name as it appeared on the back of the certificate of title was in her late husband's handwriting, not hers, and that her handwriting did not appear on the certificate of title. She was again examined on this subject at length by counsel for the plaintiff. She testified that her husband often wrote her signature without objection on her part, and that she would sign papers which he would bring home without reading what she was signing. And she insisted that she never signed any application of any kind in connection with the Packard and knew nothing about the certificate of title, and her name appearing on it.

She was examined about the bank accounts of Mr. Piasecki and herself. She testified in substance that they each had separate bank accounts, but each had the right to draw on the other's account.

"Q Did you and Mr. Piasecki have a joint checking account or separate checking accounts?

"A Well, we—they were joint in a way and yet I had my separate checking account and he had his separate checking account.

"Q Well, do you mean there were three accounts, or you could each draw separately on a joint account?

"A Yes."

"* * * * *"

"Q You mentioned this inheritance from your mother; was that put in a joint account?

"A That was in my own personal account.

"Q There were three accounts then, were there?

"A Well—.

"Q Or two, anyway?

"A Well, Mr. Piasecki could have checked out of my account and I out of his, but we used the separate accounts.

"Q I see. Each had a drawing—

"A A drawing capacity on the other."

The defendant, Chris Seely, Administrator of the Estate of the deceased, shared office space with the latter for 15 or 20 years and operated a credit bureau for which Mr. Piasecki, an attorney, did some work. Mr. Seely had seen Mr. Piasecki sign his name every day and was familiar with his handwriting. He testified that the name, Kathryn A. Piasecki, written on the back of the certificate of title, was in Mr. Piasecki's handwriting.

The plaintiff testified that on one occasion prior to the accident he saw Mrs. Piasecki come out of a market, get into the Packard car, and drive off, and Mrs. Wiebe gave similar testimony, although she was unable to fix the time when she had seen Mrs. Piasecki drive the car.

There was no evidence as to who paid the expense of operation and upkeep of the Packard.

ORS 481.115 provides that the certificate of title to an automobile "shall be prima facie evidence of the ownership of such vehicle or of an interest therein."

ORS 481.515 provides in part: "In all actions, suits or criminal proceedings when the title to, or right of possession of, any motor vehicle, trailer or semi-

trailer is involved, the record of registration and license, as it appears in the files and records of the department, is prima facie evidence of ownership or right to possession of such vehicle."

■■ The effect of the certificate of title or of the registration certificate as evidence may, of course, be overcome; and the strength of the evidence on the other side may be such that the court is warranted in declaring that the statutory *prima facie* case has been rebutted. In the analogous situation where we have considered the inference that the operator of an automobile is the agent of the owner and engaged in the owner's business while driving his car, the doctrine of our cases is that inferences, like presumptions, are "out of place when the facts are known or are admitted." *Kantola v. Lovell Auto Company*, 157 Or 534, 540, 72 P2d 61; *Consor v. Andrew*, 61 Or 483, 485, 123 P 46. See, *Butenshon v. Shoesmith*, 191 Or 76, 82, 228 P2d 426. As stated in *French v. State Industrial Accident Commission*, 156 Or 443, 455, 68 P2d 466, "When the fact otherwise presumable is negatived by proof, free from question and contradiction, no room remains for a favorable presumption, and neither court nor jury are at liberty to engage in one." The decisions bearing on this question are reviewed in *Jasper v. Wells*, 173 Or 114, 144 P2d 505.

Plaintiff does not dispute that the present case is governed by this rule, but contends that the evidence on the part of the defendant, Mrs. Piasecki, is not "of such character that but one reasonable deduction can be made therefrom," *Judson v. Bee Hive Auto Service Company*, 136 Or 1, 14, 294 P 588, 297 P 1050, and that the question of ownership of the Packard car was for the jury.

The Judson, Kantola and Jasper cases afford good

illustrations of clear and convincing evidence which this court held to be sufficient to overcome the inference as a matter of law.

We have said that the mere fact that the evidence on behalf of the person charged is uncontradicted does not necessarily preclude recovery against him, *Steele v. Hemmers*, 149 Or 381, 386, 40 P2d 1022; that the showing against the inference need not be documentary, *Miller v. Service and Sales, Inc.*, 149 Or 11, 17, 38 P2d 995, 96 ALR 628; and that the evidence may be sufficient even though it comes from an interested source, *Summerville v. Gillespie*, 181 Or 144, 153-154, 179 P2d 719; *Gossett v. Van Egmond*, 176 Or 134, 143, 155 P2d 304. See *Re Miller's Will*, 49 Or 452, 464-465, 90 P 1002, 124 AmStRep 1051, and *Ferdinand v. Agricultural Ins. Co.*, 22 NJ 482, 126 A2d 323, 62 ALR2d 1179. Cases in which the courts of other jurisdictions have passed on the sufficiency of evidence to rebut the *prima facie* case or presumption arising from registration or license plates are collected in 27 ALR2d 180-185.

Speaking to a somewhat similar question, namely, whether, in an action on a policy of theft insurance, uncontradicted evidence of a circumstantial nature that insured jewelry had been stolen entitled the plaintiff to a directed verdict, the late Chief Justice Vanderbilt said in *Ferdinand v. Agricultural Insurance Co.*, supra:

"* * * Where men of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury. * * * [Citing cases]. But when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common ex-

perience, not extraordinary, not contradicted in any way by witnesses or circumstances, and so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury. * * * [Citing cases]." 62 ALR2d 1186-1187.

■ Judged by the standards set forth in the decisions cited, we are constrained to hold that the question of ownership of the Packard car was for the jury. This conclusion is unavoidable because of the failure of the defendant, Kathryn A. Piasecki, to prove by unequivocal evidence that the car was purchased with her husband's money. Proof that a check drawn by Edward K. Piasecki was given in payment of the car, does not of itself, in view of other testimony, establish that this check was paid by the bank out of funds on deposit to Mr. Piasecki's account. Mrs. Piasecki testified that she and her husband had separate accounts, but each had the right to draw against the other's account. For all that appears, this check may have been paid out of Mrs. Piasecki's account. It was incumbent upon her to show that this was not the fact. She did not so testify, nor introduce any evidence such as the bank's records, for example, to clear up the uncertainty.

Mrs. Piasecki's testimony that she never drove the Packard was contradicted, and, in addition, the complete want of evidence as to who paid the expense of maintaining the car must be counted a significant omission.

This court does not pass upon the credibility of the witnesses nor the truth of Mrs. Piasecki's testimony that her husband owned the car. We determine only whether the evidence is such that a jury would have the right to reject it. And we are compelled to hold

that, in the words of Chief Justice Vanderbilt which we have quoted, the evidence was not "so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind."

*The Family Car Doctrine.*

■ This court, in common with about half of the American courts (Prosser on Torts, 2d ed 369), is committed to the "family car" doctrine, which "is based upon the theory that, when an automobile is maintained by the owner for the pleasure or convenience of his family, a member of the family, who is using it for his own pleasure or convenience, is the agent of the owner, and the latter is responsible for his negligence." *Gossett v. Van Egmond*, supra, 142-143; *Steele v. Hemmers*, supra; *Cockerham v. Potts*, 143 Or 80, 20 P2d 423; *McDowell v. Hurner*, 142 Or 611, 13 P2d 600, 20 P2d 395, 88 ALR 578; *Foster v. Farra*, 117 Or 286, 243 P 778.

Mrs. Piasecki testified that the Packard car, as well as the Cadillac, was used for the pleasure and convenience of the family, consisting of herself and Mr. Piasecki, and that she knew that he was going duck hunting in the Packard on the morning of the accident and had no objection to his doing so. Her counsel contend that the family car doctrine is applicable only to a father-minor-child relationship, and not as between husband and wife, particularly where the wife is the owner of the car. They argue that the doctrine carries the rules of agency to "extreme limits", and should not be further extended by applying it to a case like this. Both the prevailing and dissenting opinions in *McDowell v. Hurner*, supra, call attention to criticisms by courts and commentators of the agency theory which was evolved in order to give legal sub-

stance to the family car doctrine. The validity of these strictures may be conceded. "There is obviously an element of fiction in this supposed agency;" says Dean Prosser, "and it is quite often recognized that the doctrine is an instrument of policy, intended to place the liability upon the party most easily held responsible." Prosser on Torts (2d ed) 369. Another recognized authority, who criticizes the agency explanation of the family car principle as "not very convincing", says, "It seems better, in the absence of legislation, to frankly recognize a new rule of vicarious liability, and to predicate the departure from 'established principles' upon the real reason therefor, the demands of the welfare and safe organization of modern society. By recognizing such a basis for the doctrine, the difficulties of the agency theory are avoided." Harper on Torts, 621.

In "The Nature of the Judicial Process", p 65, Judge Cardozo wrote, "Finally, when the social needs demand one settlement rather than another, there are times when we must bend symmetry, ignore history and sacrifice custom in the pursuit of other and larger ends." Consciously or unconsciously, this may have been what the courts were doing when they decided to fasten upon the owner of a family car responsibility for the negligence of a member of the family while operating the car, even though there is no real agency within the legal meaning of that word.

However that may be, the family car doctrine has long since become part of the law of Oregon. It has not been limited to the relationship of a parent to a minor child, but in two cases was applied where the drivers of the cars were adult children of the owner. *Steele v. Hemmers, Cockerham v. Potts*, both supra. In the latter case, the driver of the car was a school

teacher 21 years of age who was living with her parents as a member of the household. The argument that because she was over 21 years of age her father, the owner of the car, was not liable for her negligence was rejected.

In four American Law Reports annotations, the cases are collected in which the question whether the family car doctrine applies as between spouses was considered. 64 ALR 873, 876; 88 ALR 613, 614; 100 ALR 1027; 132 ALR 990, 991. From these annotations it would appear that the courts are about evenly divided on the question. See 5 Am Jur 707, Automobiles § 369. But in most instances the courts which have held that the doctrine does not apply in such cases are courts which reject the doctrine altogether. Among the decisions sustaining liability are several in which the wife was the owner of the automobile and was held liable for the husband's negligent driving. *Venghis v. Nathanson*, 101 NJL 110, 127 A 175; *Wyant v. Phillips*, 116 WVa 207, 179 SE 303; *Goldstein v. Johnson*, 64 GaApp 31, 12 SE2d 92; *Chapman v. Salazar*, 40 Ariz 215, 11 P2d 613; *Ransford v. Ainsworth*, 196 Cal 279, 237 P 747. It should be noted, however, that the last two cases cited involved application of the community property laws of Arizona and California, respectively.

■ If we are to continue to adhere to the rationalization of the family car doctrine, then we see no reason why one spouse, the owner of the car, should not be made to answer for the negligence of the other when operating it in pursuance of the purpose for which it is furnished and maintained. In *McDowell v. Hurner*, supra, 142 Or at 621, we approved the reasoning that when a father furnishes an automobile for the comfort, convenience, pleasure and entertainment or out-

door recreation of his family he is engaging in what is in effect his "business," and that when a member of the family drives the car with the father's permission he is furthering that business and thus is an agent acting within the scope of his agency. A court which refused to accept the family car doctrine said of this reasoning, "A syllogism which deduced its conclusion from a major premise containing the word 'business' in one of its meanings and a minor premise containing the same word in another of its meanings, would present the fallacy known to the logicians as that of the ambiguous middle." *Smith v. Callahan*, 34 Del 129, 138, 144 A 46, 64 ALR 830. But where, as in Oregon, the doctrine, with its basis, is accepted, it should apply just as fully to a spouse who chooses to make it his "business" to furnish a car for the family purposes of himself and the other spouse as to a parent.

If, on the other hand, the fiction of agency were to be abandoned and the rule approved as a matter of policy, that is to say, to put "the financial responsibility of the owner behind the automobile which is being used by a member of the family", *Jones v. Cook*, 90 WVa 710, 111 SE 828, quoted in *Wyant v. Phillips*, supra, then it seems to us that there is just as much reason for applying that policy where the relationship is that of man and wife as when it is that of parent and child.

We turn to cases cited by the defendant, Kathryn A. Piasecki.

In *Cewe v. Schuminski*, 182 Minn 126, 233 NW 805, the car was registered in the wife's name and she signed a chattel mortgage securing the unpaid portion of the purchase price. The husband alone "procured, furnished, and maintained the car for whatever use

anybody made of it"; there was no evidence that the wife "possessed or claimed any right of use or control independently of her husband." Why the husband put the title in her name and caused the car to be so registered did not appear. The court said, "Her passive holding of title was not enough to charge her with liability for her husband's lethal negligence." In *Sundock v. Pittman*, 165 Tenn 17, 52 SW2d 155, the husband bought an automobile and gave it to his wife. He supported his wife and "presumably furnished fuel and oil for the automobile, from the proceeds of a business to which he was driving at the time of the accident." A judgment against the wife was reversed. The court said, "Liability does not result from mere ownership, as in the case before us." In *Smith v. Doyle*, 98 F2d 341, a car was bought in the father's name. A daughter who was driving the car at the time of the accident testified that she and her sister furnished the money to buy the car for them; it was bought for the use of the two daughters in going to American University, about two miles from their home; the family could use it if they wanted to; the father very seldom drove the car because he had a car of his own; the car was used for family purposes. At the time of the accident involved, the sisters were on their way to a party, and one of them was driving the car. The court said, "According to this testimony, the father was merely the purchaser and legal owner of a car which the daughters caused to be bought with their own money for their own purposes. There was no contrary testimony. There was no evidence that the father put a dollar into the purchase of the car, or took any part in the decision to buy it, or decided who should drive it or to what uses it should be put. There was

no evidence that he ever 'maintained' it in any sense, to any extent, for any purpose.

"\* \* \* The family-car doctrine rests upon the ideas that the owner of the car puts it into circulation, and that he is more likely than the driver to be financially responsible. Both ideas lose most of their force when, as in the present case, the driver provides the money with which the nominal owner makes the purchase." *Smith v. Doyle,* supra 343-344. An attempt to fasten liability on the father failed.

In two of these cases, it will be noted, the evidence showed that the spouse sought to be vicariously charged was not the owner of the automobile, but merely held the legal title thereto. In the third case, *Sundock v. Pittman,* where the husband bought the car and made a gift of it to his wife, the facts that he supported his wife and furnished fuel and oil for the automobile—matters concerning which there is no evidence in this case—were apparently thought to be significant in determining that the wife did not maintain the car for family purposes. In none of these cases was the effect of a statute such as ours, making the title to an automobile *prima facie* evidence of ownership, considered.

■ The evidence here was such that the jury could find that Mrs. Piasecki was not merely the holder of the legal title to the Packard, but its actual owner. If she was the actual owner, she had the right to control its use unless she had surrendered that right to her husband. There is strong evidence to support an inference that this was the state of the case, but we can not say that this evidence was conclusive. We have no authority to disturb the verdict of a jury based on competent substantial evidence, even though we may think it wrong. We hold, therefore, that the circuit

court did not err in denying the motion of the defendant, Kathryn A. Piasecki, for a directed verdict.

*Effect of Statute Limiting Recovery Against the Administrator.*

Several assignments of error present questions arising out of the statutory limitation of $15,000 on the damages recoverable against the estate of Edward K. Piasecki, deceased.

The complaint in each case alleged that the plaintiff was damaged in the sum of $77,000, and prayed for judgment in that amount. The defendants contend that no verdict or judgment against Kathryn A. Piasecki in excess of that against the estate of Edward K. Piasecki, deceased, is lawful, and that, in any event, the court erred in the manner in which the question of damages was submitted to the jury. These questions were raised properly in the trial court and adverse rulings with respect to them are assigned as error.

Until the enactment of Chapter 32, Oregon Laws 1937, a cause of action arising out of an injury to the person died with the person of either party, except where the death of a person was caused by the wrongful act or omission of another. See Oregon Code 1930, §§ 5-701, 5-703. The 1937 act permitted an action for injury to the person to be maintained where the wrongdoer died, but limited the recoverable damages to $10,000. It was amended by Oregon Laws 1949, ch 519 (set out, supra, footnote 1), so as to increase the amount recoverable to $15,000. This statute was in effect on November 4, 1951, the date of the accident involved in these cases. In 1953, the statutory amount was increased to $20,000. Oregon Laws 1953, ch 600, § 2, now codified as ORS 30.080.

██ The defendants, to support their contention that the damages recoverable against the defendant, Kathryn A. Piasecki, must not exceed those allowed against her co-defendant, rely on the propositions, well established in this state, that there can be no apportionment of damages between joint tort-feasors, *Stamos v. Portland Electric Power Co.*, 128 Or 310, 274 P 915 (1929), and that where vicarious liability is asserted based solely on the wrongful act of an agent exoneration of the agent exonerates the principal, *Fish v. Southern Pacific Company*, 173 Or 294, 143 P2d 917, 145 P2d 991 (1944); *Dare v. Boss*, 111 Or 190, 224 P 646 (1924); *Emmons v. Southern Pacific Co.*, 97 Or 263, 191 P 333 (1920).

█ The rule forbidding apportionment of damages between joint tort-feasors derives from the nature of the wrong.

"The tort is a thing integral and indivisible, and any claim for injuries arising therefrom, runs through and embraces every part of the tort. The liability of one cannot be carried into any portion of the joint tort that is not followed by an equal liability of the other tortfeasors. Each is liable for the whole, and the injured party may pursue one separately, or he may pursue all jointly, or any number jointly less than the whole number." 26 RCL 763, Torts § 13, quoted with approval in *Murray v. Helfrich*, 146 Or 602, 606, 30 P2d 1053. See, also, 52 Am Jur 458, Torts § 123.

The legislature could, of course, authorize the jury to make an apportionment of damages in such cases, *Chrudinsky v. Evans*, 85 Or 548, 551, 167 P 562, but that is not what it has done, for the statute does not deal with the function of the jury at all, but with that of the court. The legislature has said, in effect, that regardless of the extent of the damages actually suf-

fered by the plaintiff in an action against the estate of a deceased tort-feasor, *recoverable* damages may not exceed $15,000. It has not said that where another person is also liable for the tort he shall enjoy a similar partial immunity, nor is this a permissible interpretation of the language of the statute. It is not suggested that such a statute is beyond the powers of the legislature.

■ The present cases, however, do not involve the liability of joint tort-feasors; *Bowles v. Creason*, 159 Or 129, 157, 78 P2d 324; *Feazle v. Industrial Hospital Association*, 164 Or 630, 632, 103 P2d 300; *Emmons v. Southern Pacific Co.*, supra, p 297; but of principal and agent, and the liability of Kathryn A. Piasecki depends entirely on the application of the doctrine of *respondeat superior*. The reason why the principal can not be held if the agent is exonerated is, as the court explained in *Dare v. Boss*, supra, 111 Or 198, that "there could be no negligence except that imputed from the relationship of the parties," and so "if the collision was without negligence on the part of the driver of the car [the agent], it could not be negligence on the part of any one else." This reasoning, of course, is not germane to the question here, for the verdict of the jury has established that Edward K. Piasecki was negligent. The statutory limitation on the amount of damages recoverable against the estate was not intended and can not be construed to change the law of *respondeat superior* so as to relieve the principal from liability to the full extent of the damages found by the jury to have been suffered by the plaintiff.

■ If counsel for the defendants are right in their contention, then it would logically follow that, had the action against Edward K. Piasecki abated upon his death (as would have been the case in like circum-

stances prior to the 1937 enactment), the action against Kathryn A. Piasecki would likewise have abated, but this, we think, is not the law. For while it is true that where liability of a principal for the tort of his agent is charged on the theory of *respondeat superior*, and they are sued jointly, the judgment must be either in favor of or against both, it is also true that it is not necessary to join the agent at all. Indeed, in the view of many courts, though not of this court, such joinder is not permissible where participation of the principal in the tort is not charged. 35 Am Jur 1028, Master and Servant § 592. Liability of the principal, therefore, does not necessarily depend upon a judgment against the agent, but upon the fact of the agent's negligence. If proof of that fact may be sufficient to establish the liability of the principal where the agent is not made a party, though he might have been, we think it may be equally sufficient even though, because of some rule of law, based on considerations of public policy or the like, an action against the latter is precluded.

The underlying principle is set forth in the Restatement of Agency, § 217:

"(2) A master or other principal is not liable for acts of a servant or other agent which the agent is privileged to do although the principal himself would not be so privileged; but he may be liable for an act as to which the agent has a personal immunity from suit."

Comment B on this section contains the following illustration:

"* * * Thus, if a servant, while acting within the scope of employment, negligently injures his wife, the master is subject to liability."

Abatement of an action as to one party by reason of death has been held not to abate it as to others in

the following tort cases: *Baker v. Braslin*, 16 RI 635, 18 A 1039, 6 LRA 718 (joint tort); *Lufkin v. Cutting*, 225 Mass 599, 114 NE 822 (action against partners for tort of one of them); *Rogers v. Carmichael*, 184 Ga 496, 192 SE 39 (idem); *Swensen v. McDaniel*, 119 FSup 152 (idem); *Rice v. Van Why*, 49 Col 7, 111 P 599 (action against partners jointly liable). In a number of cases brought under a statute imposing liability on the owner of an automobile for injury caused by its negligent operation when driven with the permission of the owner, it was held that the death of the negligent driver did not abate the action against the owner. *Hatch v. Lovejoy*, 254 NYSup 35; *Sayles v. Peters*, 11 CalApp2d 401, 54 P2d 94; *Lee v. Deasy*, 19 CalApp2d 667, 66 P2d 175; *National Automobile Insurance Co. v. Cunningham*, 41 CalApp2d 828, 107 P2d 643. While, under such a statute, the liability of the owner is, as the California courts say, "direct", yet it depends, as here, upon proof of the negligence of the operator and not, as the court said in *Sayles v. Peters*, supra, "upon a judgment against the operator." See, also, 1 CJS 170, Abatement and Revival § 122; 1 Am Jur 61, Abatement and Revival § 62.

■ It is further urged, as another reason why the judgment against the defendant, Kathryn A. Piasecki, should be limited to $15,000, that she will be deprived of her right of indemnity against the administrator to the extent of $35,000. Authorities cited by counsel for the plaintiff indicate that this is a debatable assumption. *Westchester Lighting Company v. Westchester Small Estates Corp.*, 278 NY 175, 15 NE2d 567; 42 CJS 612, Indemnity § 31; see also, *Burris v. American Chicle Co.*, 120 F2d 218. We do not pass upon that question, however, for if the consequences are those that counsel claim, they are such only as

flow from valid legislation, which the courts are not empowered to ignore or amend. A similar contention advanced in *Rogers v. Carmichael*, supra, was dismissed by the court as irrelevant, and with that conclusion we agree. Nor do we think it necessary to follow counsel in their argument of hardship, based on hypothetical facts pertaining to the estate of the deceased and its devolution. The conclusive answer to the contention based on the right of indemnity is, as already shown, that where a tort action against a wrongdoer dies with his death, it may still be pursued against the wrongdoer's principal, whether or not the right of indemnity is lost.

Before trial, and again at the conclusion of the testimony, the defendants moved to strike from the complaints in each case the figure $77,000 in the allegation of damages and in the prayer for judgment. The ground of these motions as stated by counsel was that, since the amount of recovery against the administrator was limited to $15,000, "they have no cause of action for greater than $15,000 and therefore it is improper to allege $77,000, a greater figure than that, in either the damage portion or the prayer." These motions were denied. In its charge, the court submitted to the jury the issue of general damages as to both defendants without mentioning any limitation of amount. Counsel for defendants excepted to this instruction in the following language: "Defendant further excepts to the instruction by the court giving the amount of damages generally without limiting them to the sum of $15.000." As heretofore stated, the jury returned a verdict against each of the defendants in the sum of $60,000. Defendants filed a motion for an order setting aside the verdict, on the ground, among others, that the verdict was one upon which a valid judgment

could not be entered. The motions were denied and the court entered a judgment against the administrator for $15,000 and against Kathryn A. Piasecki for $60,000.

■ Regardless of the rule in other states (see Annotation, 2 ALR2d 454), it has been the accepted practice in Oregon for the court to instruct the jury that their verdict must not exceed the amount of damages alleged and prayed for in the complaint. A contention that such an instruction was error was dismissed as "untenable" in *Haltom v. Fellows,* 157 Or 514, 532, 73 P2d 680. What appears at first glance to be a criticism of a similar instruction in *Smith v. Laflar,* 143 Or 65, 70, 20 P2d 391, was not so in fact, but, as pointed out in *Ridgeway v. McGuire,* 176 Or 428, 440, 158 P2d 893, the criticism was directed to other language used by the trial judge in the same instruction, and in the case just cited an instruction that the plaintiffs "can not recover in any amount in excess of $1800.00, because that is the amount of secret profit they allege" was approved.

We have recently held, in a case governed by the statute which limits the amount of recoverable damages against a deceased tort-feasor, that it was error to deny a motion to strike from the complaint an allegation that the plaintiff was damaged in the sum of $200,000. *Bailey v. Rhodes, Adm.,* 202 Or 511, 525, 276 P2d 713. A judgment for the plaintiff was reversed on other grounds, but nothing was said in the opinion as to whether denial of the motion to strike was reversible error.

■ So, we think, in the present instance of these consolidated cases against different defendants in which different maximum verdicts were permissible,

that the court should have so informed the jury, explaining the reason for the difference.

■ Whether the course which the court took is ground for reversal is another question. The argument of the defendants in that regard is to the effect that had the jury known that the estate of Mr. Piasecki would not be liable for the full amount of the verdict, they would not have returned a verdict against Mrs. Piasecki in so large an amount. This is to say that the jury would not, in that case, have followed the court's instructions to allow the plaintiff such sum of money as general damages as "will fully and fairly compensate plaintiff for the injuries that he has suffered as a result of the collision in suit and for the permanency thereof * * *." We are unwilling to indulge in such an assumption. We think that the error was not prejudicial and, therefore, not reversible.

■ The defendants urge, however, that the court exceeded its authority in entering judgment for a different amount than that found by the jury in its verdict. Reliance is placed upon *Fiore v. Ladd,* 29 Or 528, 46 P 144, which was followed in *Printing Industry v. Banks,* 150 Or 554, 46 P2d 596, and *State Highway Commission v. Deal,* 191 Or 661, 233 P2d 242. In these cases, it was held that for the court to allow interest in the judgment, when the jury has not allowed it by their verdict, is erroneous. But these were cases in which the verdict returned was in every respect valid. In the first two, the judgments were modified by this court by eliminating the interest item. In the Deal case, we held, in reversing, that on a new trial interest should be allowed by the jury. Here, we are concerned with a verdict (in the case against the administrator) which is valid to the extent of $15,000 and invalid and without warrant of law as to the excess. We see no

reason why it was not entirely appropriate for the court to enter judgment in accordance with the valid portion. See *Schulz v. General Casualty Co.*, 233 Wis 118, 128, 288 NW 803.

*Alleged Errors in Instructions.*

 Error is assigned to the refusal of the court to give the following requested instruction:

> "There is a presumption of law applicable to this case that Edward K. Piasecki at all times exercised due care or in other words, a presumption that he was free from negligence. This presumption continues throughout the case and requires a verdict for the defendants unless it is overcome by a preponderance of evidence to the contrary."

This court is committed to the doctrine that presumptions are evidence, and that in a proper case the jury should be so instructed. *Wyckoff v. Mutual Life Insurance Co.*, 173 Or 592, 147 P2d 227. In *Fowler v. Courtemanche*, 202 Or 413, 454, 274 P2d 258, a conversion action, we held that failure to give a similar instruction was error, but the opinion does not indicate that the judgment for the plaintiff was reversed for that reason. We have also held in a negligence case growing out of an automobile accident where there was a charge of negligence against the operator of the car in which the plaintiff was riding, and the defendant requested an instruction on the presumption of due care and the plaintiff made no similar request, and the court did not instruct on the subject at all, that "the presumptions balance and cancel each other." *McVay v. Byars*, 171 Or 449, 453, 138 P2d 210. In the present cases, there were pleas of contributory negligence. Failure to instruct on the presumption of due care in that situation leaves the parties in the same relative positions they would have occupied if the court had given

such an instruction and told the jury it applied to both parties. Thus, as we said in *McVay v. Byars, supra,* the court would "set the matter at large to be determined by the onus of proof and the preponderance of evidence." The court instructed properly on the burden of proof. If there was error at all in refusing to give the requested instruction, it was certainly not reversible.

■ The defendant assigns error to the refusal of the court to give the following requested instruction:

"Circumstantial evidence is not entitled to the same weight as direct evidence on the same issue, which you believe to be true. Circumstantial evidence must also be sufficiently persuasive to negative all rival conclusions suggested by itself and which show no liability or lack of negligence in the opponent. If, at the close of the presentation of the proof, the circumstantial evidence is capable of supporting with equal reason two or more conclusions, one or more of which prove the non-liability of the opponent, the proponent has failed to discharge the burden of proof."

All except the first sentence of the foregoing is copied substantially from the court's discussion of the sufficiency of the evidence to take the case to the jury in *Sullivan v. Mountain States Power Co.,* 139 Or 282, 294, 9 P2d 1038. Whether it would ever be advisable to instruct in that language we need not decide, though we may take occasion again to observe that it is not always the part of wisdom for the trial judge to adopt verbatim in his charge to the jury the language of an appellate court opinion. *Mason v. Allen,* 183 Or 638, 645, 195 P2d 717. Putting this to one side, it is well settled that if a requested instruction is not altogether free from fault, the court need not give it. The first sentence of the request reads, "Circumstantial evidence

is not entitled to the same weight as direct evidence on the same issue, which you believe to be true." In the argument in support of the instruction, it is suggested that the entire case for the plaintiff depends upon circumstantial evidence, and a particular point is made of the allegation that the deceased failed to stop before entering the intersection. The proof of that allegation, it is said, depended upon the evidence of skidmarks and other circumstances opposed to which was the direct statement of Edward K. Piasecki "coming into the record under an exception to the hearsay rule, that he did stop, and that he looked for oncoming traffic." The argument runs that if the jury believed the truth of this statement, "it would have more weight than the circumstantial evidence."

But, if the jury believed the statement, that would settle the question, and the circumstantial evidence would be entitled to no weight whatever. The first sentence of the requested instruction, therefore, applied as counsel would apply it, contains a contradiction in terms, for it implies that circumstantial evidence may have some weight even as against opposing direct evidence which the jury believe. The objection to the instruction is that, by reason of this ambiguity, it suggests something that it does not say, namely, that direct evidence has greater probative value than circumstantial evidence. On this question, judges and learned writers are not in agreement, 1 Wigmore, Evidence (3d ed) 401, § 26; but it is not to be doubted that under our system it is for the jury alone, without suggestions from the court, to determine the "effect or value of evidence addressed to them," ORS 17.250, whether such evidence be direct or circumstantial. See *State v. Marren*, 17 Ida 766, 107 P 993. Hence, any instruction which is likely to be taken by the jury as

a direction to attach greater weight to one class of evidence than to another is improper. The cases from other jurisdictions cited by the defendants all deal with questions of sufficiency of the evidence, and none of them support the defendants' claim of error in refusing to give the requested instruction. See *Myers v. Phillips*, 197 Ga 536, 29 SE2d 700; *Foster v. Jones*, 64 GaApp 66, 12 SE2d 141; *Pennsylvania Ice & Coal Co. v. Elischer*, 106 IndApp 613, 21 NE2d 436; *Bixby v. Ayers*, 139 Neb 652, 298 NW 533. We think that the court's ruling was correct.

Three assignments of error based on exceptions to instructions taken by the defendants may be treated together.

The instructions complained of submitted to the jury the questions whether Edward K. Piasecki drove the Packard automobile at an unreasonable speed, whether he failed to keep his car under control, and failed to stop before entering the nearest crosswalk at the intersection. These issues were raised by the pleadings, but the defendants contend that there was no evidence to warrant their submission to the jury.

■ As stated, the plaintiff approached the intersection of 12th and Mission Streets from the North on 12th Street, while Mr. Piasecki was driving East on Mission Street. A flashing red light in the intersection was a signal for automobiles on Mission Street to stop before entering the nearest crosswalk at the intersection. ORS 483.136 (1). Thus, Mr. Piasecki was required to stop his car before entering the crosswalk on Mission Street immediately West of the intersection.

It was dark, the pavement was wet, and the dampness from the fog required use of the windshield swiper on an automobile.

Practically all the evidence on the question of negli-

gence was circumstantial. The plaintiff was rendered unconscious by the accident, and he could remember only that, because of the fog, which restricted visibility to less than a half block, he was driving very slowly, about fifteen miles per hour he estimated, as he entered the intersection; that he did not see the Piasecki car, but that he saw "a flash of light" at the instant of the collision. The evidence showed that there was debris on the pavement, an aftermath of the collision, mostly in the Southeast quarter of the intersection. The plaintiff testified that he was driving on his own right hand side of 12th Street; hence he must have swerved to his left immediately before the collision. Plainly visible skid marks, which the jury could have found were made by the Piasecki car, commenced 1 foot 5 inches East of the West curb extended of 12th Street, and continued in an Easterly direction across the intersection a distance of 13 feet 8 inches. There were no skid marks going North and South. There was a marked crosswalk 6 feet in width, immediately West of the intersection. The full impact of the collision was taken by the plaintiff's car approximately at the door post on the right side (it was a two-door car), and the damage sustained, which was very great, was for the most part from that point forward. The damage to the Piasecki car was mainly to the left front of it. After the collision, the plaintiff's car jumped the curb at the Southeast corner of the intersection, and came to rest about 80 to 90 feet from the center of the intersection, with its front bumper close to the gasoline pumps of a service station located on that corner. The plaintiff was thrown out of his car onto the sidewalk at the Southeast corner. The Piasecki car stopped about 60 feet South of the center of the intersection, close to the curb on the East side of 12th

Street, and headed South. Measured from curb to curb, 12th Street is approximately 45 feet in width, and Mission Street 36 feet in width.

██ The duty of both drivers was to drive at a speed which was not greater than was "reasonable and prudent, having due regard for the traffic, surface and width of the highway, the hazard at intersections and any other conditions then existing." ORS 483.102 (1). One of the "conditions then existing" was the fog, which would indicate to any prudent driver the need for extreme caution at an intersection. Another such condition applicable to Mr. Piasecki's driving was that he was about to enter an arterial highway. The first question, therefore, is whether a court could justifiably say that there was no evidence of excessive speed or failure to keep his car under control on the part of Mr. Piasecki, in view of these conditions, the skid marks and the violence of the crash, as evidenced by the damage to the vehicles and particularly to the plaintiff's car, and the subsequent movements of the cars. We think not. In numerous cases, similar evidence has been held to be relevant on the question of speed. See 5 Berry, Automobiles (7th ed) § 5.286. The defendants cite *Cameron v. Goree*, 182 Or 581, 606, 189 P2d 596, to the proposition that "damage to vehicles is not alone sufficient evidence of speed." In the first place, the relevant evidence here is not limited to damage to the vehicles. Beyond that, the cited case does not support the generalization. The defendant in that case was operating his car on an arterial highway at a place where the designated speed was 55 miles per hour, and sustained a collision with another automobile which came into the highway from an intersecting road. The defendant testified that his speed was 30-35 miles per hour. Evidence that his speed was 50 miles per hour

was held to have been erroneously excluded, and the court treated the question of the sufficiency of the evidence of speed as though that testimony had been admitted. We held that a speed of 50 miles per hour was not excessive under the circumstances, and especially in view of the fact that the car was being driven on a throughway. It was in this setting that the effects of the collision were considered and held not to be sufficient to overcome the conclusion, based on the direct evidence, that the speed was reasonable. At the same time, the opinion recognized that such evidence in the context of other sets of facts may tend to show excessive speed, and decisions of this court were cited applying that doctrine. See cases cited at 182 Or 602, and *Wilbur v. Home Lumber & Coal Co.*, 131 Or 180, 282 P 236. Always, the question is a relative one. Here, we think that the evidence as to the skid marks and the force and effects of the collision might reasonably lead to the conclusion that the Piasecki car was driven at a speed greater than was reasonable and prudent, in view of the existing conditions, and, therefore, that this question, as well as the closely allied one of proper control, was rightly submitted to the jury for their determination.

We come to the contention that the court erred in submitting to the jury the charge that the Piasecki car failed to stop before entering the intersection. As previously stated, the crosswalk was six feet wide, and the skid marks began a foot and a half East of the West curb line of 12th Street. If the car had stopped before entering the crosswalk, its rear wheels, which apparently caused the skid marks, would, under a liberal estimate, have been not more than 20 feet from the point where the skid marks began. There is no evidence as to how much speed the car, starting from

a standstill, could have picked up in that distance, but we judicially know that it could not have been very great. We also know that the distance traveled in a second is 1.47 times the rate of speed. We recognize the fact of "reaction time", that is, the time that elapses "from the moment one sees danger until he can actually get into action to avoid it." *Ashbrook v. Cleveland Railway Co.*, (OhioApp) 34 NE2d 992. See *Tuite v. Union Pacific Stages, Inc.*, 204 Or 565, 593, 284 P2d 333. Several courts have held that in the absence of affirmative proof on the subject this time will be presumed to be ¾ of a second. *Standard Oil Co. v. Crowl*, 198 F2d 580; *Vietmeier v. Voss*, (MoSCt) 246 SW2d 785; *Delay v. Ward*, 364 Mo 431, 262 SW2d 628; *McKinney v. Robbins*, (MoApp) 273 SW2d 513; *Ashbrook v. Cleveland Railway Co.*, supra. In *Kaan v. Kuhn*, 64 Wy 158, 187 P2d 138, the court said that it was "common knowledge that at least half a second after danger appears is required for the average motorist to transfer his foot from accelerator throttle to brake." In *Seeds v. Chicago Transit Authority*, 342 IllApp 303, 96 NE2d 646, the reaction time was said to be "at least a second." We also think it is common knowledge that a car "will travel *some* distance while the driver was putting on his brakes and while the brakes were taking hold with sufficient grip to skid the wheels." *State v. Belle Isle Cab Co.*, 194 Md 550, 71 A2d 435. See "Know the Law", 180-181.[@] Taking all these factors into consideration, together with the other facts in evidence, it was competent for the jury to find that Mr. Piasecki did not stop before entering the crosswalk, because if he had stopped what followed would not have occurred.

We do not think, as defendant urges, that to reach

[@] By Robert L. Donigan and Edward C. Fisher; published by The Traffic Institute of Northwestern University (1958).

such a conclusion involves "an aggravated case of basing an inference on an inference," but rather that the conclusion is reached by the use of our inveterate reasoning processes, which no statute or rule of law forbids. See *State v. Dennis*, 177 Or 73, 79, 159 P2d 838, 161 P2d 670; *McKay v. State Industrial Accident Commission*, 161 Or 191, 199, 87 P2d 202; *State v. Clark*, 99 Or 629, 666, 196 P 360.

*Error in Admission of Testimony.*

We consider next an assignment of error based on the admission of evidence over the objection of counsel for the defendants.

Floy L. Morrill, a patrolman for the Oregon State Police, was called as a witness for the plaintiff. He testified that he arrived at the scene of the accident about 5:00 a.m., that the plaintiff was lying on the sidewalk, evidently seriously injured, and that Mr. Piasecki was there walking about. He asked Mr. Piasecki what had happened, and the latter answered "that the patrol car had been going too fast, and they had hit." The record proceeds:

"Q Did he say anything about, or was there any more conversation?

"A No, I refrained from having too much conversation with him because of the circumstances, and a remark that was made about causing injury to his dog.

"Q Something was said about injuring his dog?

"A Yes, he was—(interrupted)

"MR. LEWELLING: If the Court please, I object to that as immaterial and irrelevant.

"MR. CARSON: I submit it is not, Your Honor.

(The question was read.)

"THE COURT: If that was all it referred to, I will sustain the objection.

"Q (by Mr. Carson) Was that connected in any way with the rest of the conversation, about the dog?

"A Yes, he—(interrupted)

"MR. LEWELLING: If the Court please, I will object to this entire line, whatever it may be about the dog, as being immaterial and irrelevant.

"MR. CARSON: We don't claim anything for it about the dog, Your Honor, but it is part of the conversation at the scene immediately after the accident.

"THE COURT: This was part of the conversation there at the scene of the accident?

"A Yes.

"THE COURT: I will overrule the objection.

"Q (by Mr. Carson) Will you to the best of your memory relate what the conversation was?

"A He came over to where Mr. Wiebe was—(interrupted)

"Q Mr. Piasecki, you mean?

"A Yes, sir. And I was attempting to take care of Mr. Wiebe and keep him out of shock, and he made the statement—(interrupted)

"MR. LEWELLING: If the Court please, I will renew my objection to this as being immaterial and irrelevant.

"THE COURT: Overrule the objection; you may proceed.

"Q (by Mr. Carson) You say he made the statement—

"A He made the statement that the patrol car had been going too fast, and he was quite belligerent about the fact that an accident had occurred, and I was trying to take care of Mr. Wiebe—(interrupted)

"THE COURT: Confine it to the conversation, please.

"A He made the statement who was going to take care of his dog that had been injured too, what I was going to do about his dog.

"MR. LEWELLING: If the Court please, I object to that and move for a mistrial; it is obviously introduced into the case for the prejudicial effect—a man is hit early in the morning and shaken up and they want to introduce some statement he may have made in the heat of that event purely for prejudice, the prejudicial effect it will have. It has no bearing on the case, and the only way you can cure it now is by a mistrial.

"THE COURT: You are reciting this as part of the conversation at the time?

"A Yes, sir.

"THE COURT: I will overrule the objection, and deny the motion.

"MR. LEWELLING: And give me an exception?

"THE COURT: Yes."

The ruling was clearly erroneous and prejudicial. The testimony was completely irrelevant to any question in the case. Its obvious effect was to portray Mr. Piasecki as a man completely indifferent to the suffering of the plaintiff lying on the pavement, grievously injured, as the plaintiff claimed, by Mr. Piasecki's negligent driving. This is substantially what is said in the brief of counsel for the plaintiff, in an argument intended to show the materiality of the testimony from which we quote:

"Such evidence also constitutes an admission, by conduct, of Mr. Piasecki, against his interest, and properly was receivable as such; in this, that one who would, in those fearful circumstances, display such gross callousness to the plainly threatened dissolution of another human being, well might be likely to show even a greater degree of indifference toward, and hence utter disregard of, the very traffic regulations, enacted for the protection of human life, upon the violation of which his negligence is predicated in these actions."

In personal injury actions it is not always possible to exclude the emotional. The evidence of the plaintiff's injuries, especially when they are serious and permanent, naturally tends to excite the sympathy of the jury and, notwithstanding instructions of the court to the contrary, sympathy may influence the verdict. This is sometimes unavoidable. But where, over objection, irrelevant evidence is admitted which tends to make the defendant appear hateful in the eyes of the jury, who are properly concerned only with questions of negligence and damages, it must be apparent to any reasonable person that the defendant's right to a fair trial is placed in serious jeopardy. We have no other course open to us than to hold that admission of the testimony here under consideration was reversible error.

*Other Assignments of Error.*

Two additional questions relating to the admissibility of evidence are raised by the assignments of error. One will not arise on a new trial. The other challenges the ruling of the court which sustained an objection to testimony offered to be given by the witness, Chris Seely, that Mr. Piasecki had told him that "Mr. Piasecki went up to Mr. Wiebe, lying in the intersection, and Mr. Wiebe said 'Where did you come from' or words to that effect, after he had inquired as to whether he was hurt or not." The ruling would not constitute reversible error, but we think the testimony should have been admitted under ORS 41.850, which reads in part:

"* * * When a party to an action, suit or proceeding by or against an executor or administrator appears as a witness in his own behalf, *or* offers evidence of statements made by deceased against the interest of the deceased, statements of the de-

ceased concerning the same matter in his own favor may also be proven." (Italics added.)

The plain language of the statute makes admissible statements of the deceased concerning the same matter—i.e., the "action, suit or proceeding"—whenever the plaintiff appears as a witness in his own behalf, as was the case here.

*Plaintiff's Cross-Appeal.*

■ Plaintiff has cross-appealed, contending that the circuit court erred in refusing to give a retrospective construction to the survival statute, Oregon Laws 1949, ch 519. It will be recalled that at the time of the accident this statute was in effect and limited the amount of recoverable damages to $15,000. In 1953, the statute was amended so as to increase such amount to $20,000, and also allow "recovery for all reasonable expenses paid or incurred for funeral, burial, doctor, hospital, or nursing services for the deceased." Oregon Laws 1953, ch 600, § 3, now ORS 30.080. This provision was in effect at the time of the trial of these cases in 1954, and the plaintiff contends that it should have been applied, notwithstanding the fact that the causes of action arose before its enactment. With this contention we are unable to agree, both because there is no language in the statute which evinces an intention that it should be applied retrospectively (see *Henderson v. State Tax Commission*, 182 Or 519, 522, 188 P2d 630), and because, while the statute may be regarded as procedural for some purposes, such as conflict of laws; *In re Vilas' Estate*, 166 Or 115, 123, 110 P2d 940; *Grant v. McAuliffe*, 41 Cal2d 859, 264 P2d 944; *Austin's Admr. v. Pittsburgh, C., C. & St. Louis Railway Company*, 122 Ky 304, 91 SW 742; yet the statute and, in particular, the 1953 amendment created new rights and

liabilities, and for present purposes, therefore, must be regarded as substantive and given a prospective interpretation. *Cort v. Steen*, 36 Cal2d 437, 224 P2d 723; *Regan v. Davis*, 290 Pa 167, 138 A 751, 54 ALR 1073; *Mennemeyer v. Hart*, 359 Mo. 423, 221 SW2d 960; 1 CJS 181, Abatement and Revival § 133; 50 Am Jur 500, Statutes § 478. And see 77 ALR 1340.

*Siebert v. Siebert*, 184 Or 496, 501, 199 P2d 659, held that a statute governing the allowance of alimony in force when the decree of divorce was granted would be applied, although enacted after the parties were married, but the basis of the decision was the interest of the state in the relationship created by the marriage contract. See *Krieg v. Krieg*, 153 Wash 610, 278 P 223.

We think the cross-appeal is without merit.

For the error found in the admission of testimony, the judgment is reversed and the cause remanded for further proceedings in conformity with this opinion.